# ATTACHMENT A

| 95TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT 95– |
|---|---|---|
| 2d Session | | 1283, Pt. I |

# FOREIGN INTELLIGENCE SURVEILLANCE ACT OF 1978

JUNE 8, 1978.—Ordered to be printed

Mr. BOLAND, from the Permanent Select Committee on Intelligence, submitted the following

# REPORT

together with

## SUPPLEMENTAL, ADDITIONAL, AND DISSENTING VIEWS

[To accompany H.R. 7308 which on November 4, 1977, was referred jointly to the Committee on the Judiciary and the Permanent Select Committee on Intelligence]

The Permanent Select Committee on Intelligence, to whom was referred the bill (H.R. 7308) to amend title 18, United States Code, to authorize applications for a court order approving the use of electronic surveillance to obtain foreign intelligence information, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

## AMENDMENTS

Strike all after the enacting clause and insert in lieu thereof:

That this act may be cited as the "Foreign Intelligence Surveillance Act of 1978".

## TABLE OF CONTENTS

TITLE I—ELECTRONIC SURVEILLANCE WITHIN THE UNITED STATES FOR FOREIGN INTELLIGENCE PURPOSES

Sec. 101. Definitions.
Sec. 102. Authorization for electronic surveillance for foreign intelligence purposes.
Sec. 103. Special courts.
Sec. 104. Application for an order.
Sec. 105. Issuance of an order.
Sec. 106. Use of information.
Sec. 107. Report of electronic surveillance.
Sec. 108. Congressional oversight.
Sec. 109. Penalties.
Sec. 110. Civil liability.

TITLE II—CONFORMING AMENDMENTS

Sec. 201. Amendments to chapter 119 of title 18, United States Code.

TITLE III—EFFECTIVE DATE

Sec. 301. Effective date.

29–228

2

# TITLE I—ELECTRONIC SURVEILLANCE WITHIN THE UNITED STATES FOR FOREIGN INTELLIGENCE PURPOSES

## DEFINITIONS

SEC. 101. As used in this title:

(a) "Foreign power" means—

(1) a foreign government or any component thereof, whether or not recognized by the United States;

(2) a faction of a foreign nation or nations, not substantially composed of United States persons;

(3) an entity that is openly acknowledged by a foreign government or governments to be directed and controlled by such foreign government or governments;

(4) a group engaged in international terrorism or activities in preparation therefor;

(5) a foreign-based political organization, not substantially composed of United States persons; or

(6) an entity that is directed and controlled by a foreign government or governments.

(b) "Agent of a foreign power" means—

(1) any person other than a United States person who—

(A) acts in the United States as an officer, member, or employee of a foreign power; or

(B) acts for or on behalf of a foreign power which engages in clandestine intelligence activities in the United States contrary to the interests of the United States, when the circumstances of such person's presence in the United States indicate that such person may engage in such activities in the United States, or when such person knowingly aids or abets any person in the conduct of such activities or knowingly conspires with any person to engage in such activities; or

(2) any person who—

(A) knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or may involve a violation of the criminal statutes of the United States;

(B) pursuant to the direction of an intelligence service or network of a foreign power, knowingly engages in any other clandestine intelligence activities for or on behalf of such foreign power, which activities involve or are about to involve a violation of the criminal statutes of the United States;

(C) knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power; or

(D) knowingly aids or abets any person in the conduct of activities described in subparagraph (A), (B), or (C) or knowingly conspires with any person to engage in activities described in subparagraph (A), (B), or (C).

(c) "International terrorism" means activities that—

(1) involve violent acts or acts dangerous to human life that are or may be a violation of the criminal laws of the United States or of any State, or that might involve a criminal violation if committed within the jurisdiction of the United States or any State;

(2) appear to be intended—

(A) to intimidate or coerce a civilian population,

(B) to influence the policy of a government by intimidation or coercion, or

(C) to affect the conduct of a government by assassination or kidnapping; and

(3) occur totally outside the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to coerce or intimidate, or the locale in which their perpetrators operate or seek asylum.

3

(d) "Sabotage" means activities that involve or may involve a violation of chapter 105 of title 18, United States Code, or that might involve such a violation if committed against the United States.

(e) "Foreign intelligence information" means—

(1) information that relates to and, if concerning a United States person, is necessary to the ability of the United States to protect against—

(A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power; .

(B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

(C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or

(2) information with respect to a foreign power or foreign territory that relates to and, if concerning a United States person, is necessary to—

(A) the national defense or the security of the United States; or

(B) the conduct of the foreign affairs of the United States.

(f) "Electronic surveillance" means—

(1) the acquisition by, an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes;

(2) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States;

(3) the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the sender and all intended recipients are located within the United States; or

(4) the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

(g) "Attorney General" means the Attorney General of the United States (or Acting Attorney General) or the Deputy Attorney General.

(h) "Minimization procedures" with respect to electronic surveillance means—

(1) specific procedures, which shall be adopted by the Attorney General, that are reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition, retention, and dissemination of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information;

(2) procedures that require that nonpublicly available information, which is not foreign intelligence information, as defined in subsection (e)(1), shall not be disseminated in a manner that identifies any individual United States person, without such person's consent, unless such person's identity is necessary to understand foreign intelligence information or assess its importance;

(3) Notwithstanding paragraphs (1) and (2), procedures that allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for the purpose of preventing the crime or enforcing the criminal law; and

(4) notwithstanding paragraphs (1), (2), and (3), with respect to any electronic surveillance approved pursuant to section 102(a), procedures that require that no contents of any communication to which a United States person is a party shall be disclosed, disseminated, or used for any purpose or retained for longer than twenty-four hours unless a court order under section 105 is obtained or unless the Attorney General determines that the

4

information may indicate a threat of death or serious bodily harm to any person.

(i) "United States person" means a citizen of the United States, an alien lawfully admitted for permanent residence (as defined in section 101(a)(20) of the Immigration and Nationality Act), an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States, but does not include a corporation or an association which is a foreign power, as defined in subsection (a) (1), (2), or (3).

(j) "United States", when used in a geographic sense, means all areas under the territorial sovereignty of the United States and the Trust Territory of the Pacific Islands.

(k) "Aggrieved person" means a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance.

(l) "Wire communication" means any communication while it is being carried by a wire, cable, or other like connection furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications.

(m) "Person" means any individual, including any officer or employee of the Federal Government, or any group, entity, association, corporation, or foreign power.

(n) "Contents", when used with respect to a communication, includes any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication.

### AUTHORIZATION FOR ELECTRONIC SURVEILLANCE FOR FOREIGN INTELLIGENCE PURPOSES

SEC. 102. (a)(1) Notwithstanding any other law, the President, through the Attorney General, may authorize electronic surveillance without a court order under this title to acquire foreign intelligence information for periods of up to one year if the Attorney General certifies in writing under oath that—

(A) the electronic surveillance is solely directed at—

(i) communications exclusively between or among foreign powers, as defined in section 101(a) (1), (2), or (3); or

(ii) the acquisition of technical intelligence from property or premises under the open and exclusive control of a foreign power, as defined in section 101(a) (1), (2), or (3), and

(B) the proposed minimization procedures with respect to such surveillance meet the definition of minimization procedures under section 101(h); and

if the Attorney General shall report such minimization procedures and any changes thereto to the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence at least 30 days prior to their effective date, unless the Attorney General determines immediate action is required and notifies the committees immediately of such minimization procedures and the reason for their becoming effective immediately.

(2) An electronic surveillance authorized by this subsection may be conducted only in accordance with the Attorney General's certification and the minimization procedures adopted by him.

(3) With respect to electronic surveillance authorized by this subsection, the Attorney General may direct a specified communication common carrier to—

(A) furnish all information, facilities, or technical assistance necessary to accomplish the electronic surveillance in such a manner as will protect its secrecy and produce a minimum of interference with the services that such carrier is providing its customers; and

(B) maintain under security procedures approved by the Attorney General and the Director of Central Intelligence any records concerning the surveillance or the aid furnished which such carrier wishes to retain.

The Government shall compensate, at the prevailing rate, such carrier for furnishing such aid.

(b) Applications for a court order under this title are authorized if the President has, by written authorization, empowered the Attorney General to approve

5

applications to the Special Court having jurisdiction under section 103, and a judge to whom an application is made may, notwithstanding any other law, grant an order, in conformity with section 105, approving electronic surveillance of a foreign power or an agent of a foreign power for the purpose of obtaining foreign intelligence information, except that the Special Court shall not have jurisdiction to grant any order approving electronic surveillance directed solely as described in paragraph (1) (A) of subsection (a) unless such surveillance may involve the acquisition of communications of any United States person.

SPECIAL COURTS

SEC. 103. (a) There is established a Special Court of the United States with jurisdiction throughout the United States to carry out the judicial duties of this title. The Chief Justice of the United States shall publicly designate at least one judge from each of the judicial circuits, nominated by the chief judges of the respective circuits, who shall be members of the Special Court and one of whom the Chief Justice shall publicly designate as the chief judge. The Special Court shall sit continuously in the District of Columbia.

(b) There is established a Special Court of Appeals with jurisdiction to hear appeals from decisions of the Special Court and any other matter assigned to it by this title. The Chief Justice shall publicly designate six judges, one of whom shall be publicly designated as the chief judge, from among judges nominated by the chief judges of the district courts of the District of Columbia, the Eastern District of Virginia and the District of Maryland, and the United States Court of Appeals for the District of Columbia, any three of whom shall constitute a panel for purposes of carrying out its duties under this title.

(c) The judges of the Special Court and the Special Court of Appeals shall be designated for six-year terms, except that the Chief Justice shall stagger the terms of the members originally chosen. No judge may serve more than two full terms.

(d) The chief judges of the Special Court and the Special Court of Appeals shall, in consultation with the Attorney General and the Director of Central Intelligence, establish such document, physical, personnel, or communications security measures as are necessary to protect information submitted to or produced by the Special Court or Special Court of Appeals from unauthorized disclosure.

(e) Proceedings under this title shall be conducted as expeditiously as possible. If any application to the Special Court is denied, the court shall record the reasons for that denial, and the reasons for that denial shall, upon the motion of the party to whom the application was denied, be transmitted under seal to the Special Court of Appeals.

(f) Decisions of the Special Court of Appeals shall be subject to review by the Supreme Court of the United States in the same manner as a judgment of a United States court of appeals as provided in section 1254 of title 28, United States Code, except that the Supreme Court may adopt special procedures with respect to security appropriate to the case.

(g) The Chief Judges of the Special Court and the Special Court of Appeals may, in consultation with the Attorney General and Director of Central Intelligence and consistent with subsection (d)—

(1) designate such officers or employees of the Government, as may be necessary, to serve as employees of the Special Court and Special Court of Appeals; and

(2) promulgate such rules or administrative procedures as may be necessary to the efficient functioning of the Special Court and Special Court of Appeals.

Any funds necessary to the operation of the Special Court and the Special Court of Appeals may be drawn from appropriations for the Department of Justice. The Department of Justice shall provide such fiscal and administrative services as may be necessary for the Special Court and Special Court of Appeals.

APPLICATION FOR AN ORDER

SEC. 104. (a) Each application for an order approving electronic surveillance under this title shall be made by a Federal officer in writing upon oath or affirmation to a judge having jurisdiction under section 103. Each application shall require the approval of the Attorney General based upon his finding that it

6

satisfies the criteria and requirements of such application as set forth in this title. It shall include—

(1) the identity of the Federal officer making the application;

(2) the authority conferred on the Attorney General by the President of the United States and the approval of the Attorney General to make the application;

(3) the identity, if known, or a description of the target of the electronic surveillance;

(4) a statement of the facts and circumstances relied upon by the applicant to justify his belief that—

(A) the target of the electronic surveillance is a foreign power or an agent of a foreign power; and

(B) each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;

(5) a statement of the proposed minimization procedures;

(6) a detailed description of the nature of the information sought and the type of communications or activities to be subjected to the surveillance;

(7) a certification or certifications by the Assistant to the President for National Security Affairs or an executive branch official or officials designated by the President from among those executive officers employed in the area of national security or defense and appointed by the President with the advice and consent of the Senate—

(A) that the certifying official deems the information sought to be foreign intelligence information;

(B) that the purpose of the surveillance is to obtain foreign intelligence information;

(C) that such information cannot reasonably be obtained by normal investigative techniques;

(D) that designates the type of foreign intelligence information being sought according to the categories described in section 101(e); and

(E) including a statement of the basis for the certification that—

(i) the information sought is the type of foreign intelligence information designated; and

(ii) such information cannot reasonably be obtained by normal investigative techniques;

(8) a statement of the means by which the surveillance will be affected;

(9) a statement of the facts concerning all previous applications that have been made to any judge under this title involving any of the persons, facilities, or places specified in the application, and the action taken on each previous application;

(10) a statement of the period of time for which the electronic surveillance is required to be maintained, and if the nature of the intelligence gathering is such that the approval of the use of electronic surveillance under this title should not automatically terminate when the described type of information has first been obtained, a description of facts supporting the belief that additional information of the same type will be obtained thereafter; and

(11) whenever more than one electronic, mechanical, or other surveillance device is to be used with respect to a particular proposed electronic surveillance, the coverage of the devices involved and what minimization procedures apply to information acquired by each device.

(b) Whenever the target of the electronic surveillance is a foreign power, as defined in section 101(a) (1), (2), or (3), and each of the facilities or places at which the surveillance is directed is owned, leased, or exclusively used by that foreign power, the application need not contain the information required by paragraphs (6), (7)(E), (8), and (11) of subsection (a), but shall contain such information about the surveillance techniques and communications or other information concerning United States persons likely to be obtained as may be necessary to assess the proposed minimization procedures.

(c) The Attorney General may require any other affidavit or certification from any other officer in connection with the application.

(d) The judge may require the applicant to furnish such other information as may be necessary to make the determinations required by section 105.

ISSUANCE OF AN ORDER

SEC. 105. (a) Upon an application made pursuant to section 104, the judge shall enter an ex parte order as requested or as modified approving the electronic surveillance if he finds that—

(1) the President has authorized the Attorney General to approve applications for electronic surveillance for foreign intelligence information;

(2) the application has been made by a Federal officer and approved by the Attorney General;

(3) on the basis of the facts submitted by the applicant there is probable cause to believe that—

(A) the target of the electronic surveillance is a foreign power or an agent of a foreign power: *Provided,* That no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States; and

(B) each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;

(4) the proposed minimization procedures meet the definition of minimization procedures under section 101(h); and

(5) the application which has been filed contains all statements and certifications required by section 104 and, if the target is a United States person, the certification or certifications are not clearly erroneous on the basis of the statement made under section 104(a)(7)(E) and any other information furnished under section 104(d).

(b) An order approving an electronic surveillance under this section shall—

(1) specify—

(A) the identity, if known, or a description of the target of the electronic surveillance;

(B) the nature and location of each of the facilities or places at which the electronic surveillance will be directed;

(C) the type of information sought to be acquired and the type of communications or activities to be subjected to the surveillance;

(D) the means by which the electronic surveillance will be effected;

(E) the period of time during which the electronic surveillance is approved; and

(F) whenever more than one electronic, mechanical, or other surveillance device is to be used under the order, the authorized coverage of the devices involved and what minimization procedures shall apply to information subject to acquisition by each device; and

(2) direct—

(A) that the minimization procedures be followed;

(B) that, upon the request of the applicant, a specified communication or other common carrier, landlord, custodian, or other specified person furnish the applicant forthwith any and all information, facilities, or technical assistance necessary to accomplish the electronic surveillance in such manner as will protect its secrecy and produce a minimum of interference with the services that such carrier, landlord, custodian, or other person is providing that target of electronic surveillance;

(C) that such carrier, landlord, custodian or other person maintain under security procedures approved by the Attorney General and the Director of Central Intelligence any records concerning the surveillance or the aid furnished that such person wishes to retain; and

(D) that the applicant compensate, at the prevailing rate, such carrier, landlord, custodian, or other person for furnishing such aid.

(c) Whenever the target of the electronic surveillance is a foreign power, as defined in section 101(a)(1), (2), or (3), and each of the facilities or places at which the surveillance is directed is owned, leased, or exclusively used by that foreign power, the order need not contain the information required by subparagraphs (C), (D), and (F) of subsection (b)(1), but shall generally describe the information sought the communications or activities to be subjected to the surveillance, and the type of electronic surveillance involved, incuding whether physical entry is required.

8

.(d) (1) An order issued under this section may approve an electronic surveillance for the period necessary to achieve its purpose, or for ninety days, whichever is less, except that an order under this section shall approve an electronic surveillance targeted against a foreign power, as defined in section 101(a)(1), (2), or (3), for the period specified in the application or for one year, whichever is less.

(2) Extensions of an order issued under this title may be granted on the same basis as an orignal order upon an application for an extension and new findings made in the same manner as required for an original order, except that an extension of an order under this chapter for a surveillance targeted against a foreign power, as defined in section 101(a)(4), (5), or (6), may be for a period not to exceed one year if the judge finds probable cause to believe that no communication of any individual United States person will be acquired during the period.

(3) At the end of the period of time for which electronic surveillance is approved by an order or an extension, the judge may assess compliance with the minimization procedures by reviewing the circumstances under which information concerning United States persons was acquired, retained, or disseminated.

.(e) Notwithstanding any other provision of this title, when the Attorney General reasonably determines that—

(1) an emergency situation exists with respect to the employment of electronic surveillance to obtain foreign intelligence information before an order authorizing such surveillance can with due diligence be obtained, and

(2) the factual basis for issuance of an order under this title to approve such surveillance exists,

he may authorize the emergency employment of electronic surveillance if a judge designated pursuant to section 103 is informed by the Attorney General or his designee at the time of such authorization that the decision has been made to employ emergency electronic surveillance and if an application in accordance with this title is made to that judge as soon as practicable, but not more than twenty-four hours after the Attorney General authorizes such surveillance. If the Attorney General authorizes such emergency employment of electronic surveillance, he shall require that the minimization procedures required by this title for the issuance of a judicial order be followed. In the absence of a judicial order approving such electronic surveillance, the surveillance shall terminate when the information sought is obtained, when the application for the order is denied, or after the expiration of twenty-four hours from the time of authorization by the Attorney General, whichever is earliest. In the event that such application for approval is denied, or in any other case where the electronic surveillance is terminated and no order is issued approving the surveillance, no information obtained or evidence derived from such surveillance shall be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in or before any court, grand jury, department, office, agency, regulatory body, legislative committee, or other authority of the United States, a State or political subdivision thereof, and no information concerning any United States person acquired from such surveillance shall subsequently be used or disclosed in any other manner by Federal officers or employees without the consent of such person, except with the approval of the Attorney General if the information may indicate a threat of death or serious bodily harm to any person. A denial of the application made under this subsection may be reviewed as provided in section 103.

(f) Notwithstanding any other provision of this title, officers, agents of the United States are authorized in the normal course of their official duties to conduct electronic surveillance not targeted against the communications of any particular person or persons, under procedures approved by the Attorney General, solely to—

(1) test the capability of electronic equipment, if—

(A) it is not reasonable to obtain the consent of the persons incidentally subjected to the surveillance;

(B) the test is limited in extent and duration to that necessary to determine the capability of the equipment; and

(C) the contents of any communication acquired are retained and used only for the purpose of determining the capability of the equipment, are disclosed only to test personnel, and are destroyed before or immediately upon completion of the test;

9

(2) determine the existence and capability of electronic surveillance equipment being used by persons not authorized to conduct electronic surveillance, if—

    (A) it is not reasonable to obtain the consent of persons incidentally subjected to the surveillance;

    (B) such electronic surveillance is limited in extent and duration to that necessary to determine the existence and capability of such equipment; and

    (C) any information acquired by such surveillance is used only to enforce chapter 119 of title 18, United States Code, or section 605 of the Communications Act of 1934, or to protect information from unauthorized surveillance; or

(3) train intelligence personnel in the use of electronic surveillance equipment, if—

    (A) it is not reasonable to—

        (i) obtain the consent of the persons incidentally subjected to the surveillance;

        (ii) train persons in the course of surveillance otherwise authorized by this title; or

        (iii) train persons in the use of such equipment without engaging in electronic surveillance;

    (B) such electronic surveillance is limited in extent and duration to that necessary to train the personnel in the use of the equipment; and

    (C) no contents of any communication acquired are retained or disseminated for any purpose, but are destroyed as soon as reasonably possible.

(g) Certifications made by the Attorney General pursuant to section 102(a) and applications made and orders granted under this title shall be retained in accordance with the security procedures established pursuant to section 103 for a period of at least ten years from the date of the application.

#### USE OF INFORMATION

SEC. 106. (a) Information acquired from an electronic surveillance conducted pursuant to this title concerning any United States person may be used and disclosed by Federal officers and employees without the consent of the United States person only in accordance with the minimization procedures required by this title. No otherwise privileged communication obtained in accordance with, or in violation of, the provisions of this title shall lose its privileged character. No information acquired from an electronic surveillance pursuant to this title may be used or disclosed by Federal officers or employees except for lawful purposes.

(b) No information acquired pursuant to this title shall be disclosed for law enforcement purposes unless such disclosure is accompanied by a statement that such information, or any information derived therefrom, may only be used in a criminal proceeding with the advance authorization of the Attorney General.

(c) Whenever the Government intends to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, against an aggrieved person, any information obtained or derived from an electronic surveillance of that aggrieved person pursuant to the authority of this title, the Government shall, prior to the trial, hearing, or other proceeding or at a reasonable time prior to an effort to so disclose or so use that information or submit it in evidence, notify the aggrieved person and the court or other authority in which the information is to be disclosed or used that the Government intends to so disclose or so use such information.

(d) Whenever any State or political subdivision thereof intends to enter into evidence or otherwise use or disclose in any trial, hearing, or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of a State or a political subdivision thereof, against an aggrieved person any information obtained or derived from an electronic surveillance of that aggrieved person pursuant to the authority of this title, the State or political subdivision thereof shall notify the aggrieved person, the court or other authority in which the information is to be disclosed or used, and the Attorney General that the State or political subdivision thereof intends to so disclose or so use such information.

10

(e) Any person against whom evidence obtained or derived from an electronic surveillance to which he is an aggrieved person is to be, or has been, introduced or otherwise used or disclosed in any trial, hearing, or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State or a political subdivision thereof, may move to suppress the evidence obtained or derived from such electronic surveillance on the grounds that—

(1) the information was unlawfully acquired; or

(2) the surveillance was not made in conformity with an order of authorization or approval.

Such a motion shall be made before the trial, hearing, or other proceeding unless there was no opportunity to make such a motion or the person was not aware of the grounds of the motion.

(f) Whenever a court or other authority is notified pursuant to subsection (c) or (d), or whenever a motion is made pursuant to subsection (e) and the Government concedes that information obtained or derived from an electronic surveillance pursuant to the authority of this title as to which the moving party is an aggrieved person is to be, or has been, introduced or otherwise used or disclosed in any trial, hearing, or other proceeding, the Government may make a motion before the Special Court to determine the lawfulness of the electronic surveillance. Unless all the judges of the Special Court are so disqualified, the motion may not be heard by a judge who granted or denied an order or extension involving the surveillance at issue. Such motion shall stay any action in any court or authority to determine the lawfulness of the surveillance. In determining the lawfulness of the surveillance, the Special Court shall, notwithstanding any other law, if the Attorney General files an affidavit under oath with the Special Court that disclosure would harm the national security of the United States or compromise foreign intelligence sources and methods, review in camera the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted. In making this determination, the Special Court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials if there is a reasonable question as to the legality of the surveillance and if disclosure would likely promote a more accurate determination of such legality, or if such disclosure would not harm the national security.

(g) Except as provided in subsection (f), whenever any motion or request is made pursuant to any statute or rule of the United States or any State before any court or other authority of the United States or any State to discover or obtain applications or orders or other materials relating to surveillance pursuant to the authority of this title or to discover, obtain, or suppress any information obtained from electronic surveillance pursuant to the authority of this title, and the court or other authority determines that the moving pary is an aggrieved person, if the Attorney General files with the Special Court of Appeals an affidavit under oath that an adversary hearing would harm the national security or compromise foreign intelligence sources and methods and that no information obtained from electronic surveillance pursuant to the authority of this title, and this title has been or is about to be used by the Government in the case before the court or other authority, the Special Court of Appeals shall, notwithstanding any other law, stay the proceeding before the other court or authority and review in camera and ex parte the application, order, and such other materials as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted. In making this determination, and the Special Court of Appeals still disclose, under appropriate security procedures and protective orders, to the aggrieved person or his attorney portions of the application, order, or other materials relating to the surveillance only if necessary to afford due process to the aggrieved person.

(h) If the Special Court pursuant to subsection (f) or the Special Court of Appeals pursuant to subsection (g) determines the surveillance was not lawfully authorized and conducted, it shall, in accordance with the requirements of the law, suppress the evidence which was unlawfully obtained or derived from electronic surveillance of the aggrieved person or otherwise grant the motion of the aggrieved person. If the Special Court pursuant to subsection (f) or the Special Court of Appeals pursuant to subsection (g) determines the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure.

11

(i) Orders granting or denying motions or requests under subsection (h), decisions under this section as to the lawfulness of electronic surveillance, and, absent a finding of unlawfulness, orders of the Special Court or Special Court of Appeals granting or denying disclosure of applications, orders, or other materials relating to a surveillance shall be final orders and binding upon all courts of the United States and the several States except the Special Court of Appeals and the Supreme Court.

(j) In circumstances involving the unintentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the sender and all intended recipients are located within the United States, such contents shall be destroyed upon recognition, unless the Attorney General determines that the contents may indicate a threat of death or serious bodily harm to any person.

(k) If an emergency employment of electronic surveillance is authorized under section 105(e) and a subsequent order approving the surveillance is not obtained, the judge shall cause to be served on any United States person named in the application and on such other United States persons subject to electronic surveillance as the judge may determine in his discretion it is in the interest of justice to serve, notice, of—

(1) the fact of the application;
(2) the period of the surveillance; and
(3) the fact that during the period information was or was not obtained.

On an ex parte showing of good cause to the judge the serving of the notice required by this subsection may be postponed or suspended for a period not to exceed ninety days. Thereafter, on a further ex parte showing of good cause, the court shall forego ordering the serving of the notice required under this subsection.

REPORT OF ELECTRONIC SURVEILLANCE

SEC. 107. In April of each year, the Attorney General shall transmit to the Administrative Office of the United States Courts and to Congress a report setting forth with respect to the preceding calendar year—

(a) the total number of applications made for orders and extensions of orders approving electronic surveillance under this title; and

(b) the total number of such orders and extensions either granted, modified, or denied.

CONGRESSIONAL OVERSIGHT

SEC. 108. On a semiannual basis the Attorney General shall fully inform the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence concerning all electronic surveillance under this title. Nothing in this title shall be deemed to limit the authority and responsibility of those committees to obtain such additional information as they may need to carry out their respective functions and duties.

PENALTIES

SEC. 109. (a) OFFENSE.—A person is guilty of an offense if he intentionally—

(1) engages in electronic surveillance under color of law except as authorized by statute; or

(2) violates section 102(a)(2), 105(e), 105(f), 105(g), 106(a), 106(b), or 106(j) or any court order issued pursuant to this title, knowing his conduct violates an order or this title.

(b) DEFENSE.—(1) It is a defense to a prosecution under subsection (a)(1) that the defendant was a law enforcement or investigative officer engaged in the course of his official duties and the electronic surveillance was authorized by and conducted pursuant to a search warrant or court order of a court of competent jurisdiction.

(2) It is a defense to a prosecution under subsection (a)(2) that the defendant acted in good faith belief that his actions did not violate any provisions of this title or any court order issued pursuant to this title, under circumstances where that belief was reasonable.

(c) PENALTY.—An offense described in this section is punishable by a fine of not more than $10,000 or imprisonment for not more than five years, or both.

12

(d) JURISDICTION.—There is Federal jurisdiction over an offense under this section if the person committing the offense was an officer or employee of the United States at the time the offense was committed.

CIVIL LIABILITY

SEC. 110. CIVIL ACTION.—An aggrieved person, other than a foreign power or an agent of a foreign power, as defined in section 101 (a) or (b) (1) (A), respectively, who has been subjected to an electronic surveillance or whose communication has been disseminated or used in violation of section 109 shall have a cause of action against any person who committed such violation and shall be entitled to recover—
    (a) actual damages, but not less than liquidated damages of $1,000 or $100 per day for each day of violation, whichever is greater;
    (b) punitive damages; and
    (c) a reasonable attorney's fees and other investigation and litigation costs reasonably incurred.

TITLE II—CONFORMING AMENDMENTS

AMENDMENTS TO CHAPTER 119 OF TITLE 18, UNITED STATES CODE

SEC. 201. Chapter 119 of title 18, United States Code, is amended as follows:
    (e) Section 2511(2)(a)(ii) is amended to read as follows:
    "(ii) Notwithstanding any other law, communication common carriers, their officers, employees, and agents, landlords, custodians, or other persons, are authorized to provide information, facilities, or technical assistance to persons authorized by law to intercept wire or oral communications or to conduct electronic surveillance, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, if the common carrier, its officers, employees, or agents, landlord, custodian, or other specified person, has been provided with—
        "(A) a court order directing such assistance signed by the authorizing judge, or
        "(B) a certification in writing by a person specified in section 2518(7) of this title or the Attorney General of the United States that no warrant or court order is required by law, that all statutory requirements have been met, and that the specified assistance is required,
setting forth the period of time during which the provision of the information, facilities, or technical assistance is authorized and specifying the information, facilities, or technical assistance required. No communication common carrier, officer, employee, or agent thereof, or landlord, custodian, or other specified person shall disclose the existence of any interception or surveillance or the device used to accomplish the interception or surveillance with respect to which the person has been furnished an order or certification under this subparagraph, except as may otherwise be required by legal process and then only after prior notification to the Attorney General or to the principal prosecuting attorney of a State or any political subdivision of a State, as may be appropriate. No cause of action shall lie in any court against any communication common carrier, its officers, employees, or agents, landlord, custodian, or other specified person for providing information, facilities, or assistance in accordance with the terms of an order or certification under this subparagraph.".

    (b) Section 2511(2) is amended by adding at the end thereof the following new provisions:
    "(e) Notwithstanding any other provision of this title or section 605 or 606 of the Communications Act of 1934, it shall not be unlawful for an officer, employee, or agent of the United States in the normal course of his official duty to conduct electronic surveillance, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, as authorized by that Act.
Act of 1934, shall be deemed to affect the acquisition by the United States Government of foreign intelligence information from international or foreign communications by a means other than electronic surveillance as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, and procedures in this chapter and the Foreign Intelligence Surveillance Act of 1978 shall be

13

the exclusive means by which electronic surveillance, as defined in section 101 of such Act, and the interception of domestic wire and oral communications may be conducted.".

(c) Section 2511(3) is repealed.

(d) Section 2518(1) is amended by inserting "under this chapter" after "communication".

(e) Section 2518(4) is amended by inserting "under this chapter" after both appearances of "wire or oral communication".

(f) Section 2518(9) is amended by striking out "intercepted" and inserting "intercepted pursuant to this chapter" after "communication".

(g) Section 2518(10) is amended by striking out "intercepted" and inserting "intercepted pursuant to this chapter" after the first appearance of "communication".

(h) Section 2519(3) is amended by inserting "pursuant to this chapter" after "wire or oral communications" and after "granted or denied".

## TITLE III—EFFECTIVE DATE

### EFFECTIVE DATE

SEC. 301. The provisions of this Act and the amendments made hereby shall become effective upon the date of enactment of this Act, except that any electronic surveillance approved by the Attorney General to gather foreign intelligence information shall not be deemed unlawful for failure to follow the procedures of this Act, if that surveillance is terminated or an order approving that surveillance is obtained under title I of this Act within ninety days following the designation of the chief judges pursuant to section 103 of this Act.

Amend the title so as to read:

A bill to authorize electronic surveillance to obtain foreign intelligence information.

### HISTORY OF THE BILL

In 1976, the Ford administration under the leadership of Attorney General Levi took the revolutionary step of supporting legislation to require a judicial warrant for foreign intelligence electronic surveillances in the United States. While bills which would have created such a requirement had been introduced in the House and Senate each year since 1973, previous administrations' responses were emphatically negative. As then Assistant Attorney General Henry Peterson testified in 1974 before the House Judiciary Committee, "let me be very brief. We oppose these bills. That is it." Attorney General Levi, however, working closely with leaders of the House and Senate, drafted a bill which was introduced in both the House and Senate in 1976 with broad bipartisan support. That bill, as amended, was favorably reported by the Senate Judiciary and Intelligence Committees in 1976, but the session ended before the full Senate could act on the legislation.

The Carter administration, and especially Attorney General Bell, again working closely with House and Senate leaders, picked up where the Ford administration left off, supporting the introduction of a new bill, S. 1566 in the Senate and H.R. 7308 in the House, on May 18, 1977. The Senate bill was favorably reported with amendments by the Senate Judiciary Committee on November 15, 1977, and by the Senate Intelligence Committee on March 14, 1978. S. 1566 was passed by the Senate on April 20, 1978, by a vote of 95-1. In the House, the bill, H.R. 7308, was referred to the Committee on the Judiciary. With

54

tended to be covered if a warrant would be required for law enforcement purposes, as determined on the basis of an assessment of the
similarity with other surveillance activities which the courts have
ruled upon, and the reasonableness of the expectation of privacy that
a U.S. person would have with respect to such activity.

In response to questions from the committee, the Department of
Justice opined that foreign governments—and in some circumstances their diplomatic agents have no fourth amendment rights under
the Constitution, *see* footnote 34, infra. Whether the Department of
Justice is correct in its opinion, on an issue which has never been addressed by any court, the coverage of the definition of "electronic surveillance" is not intended—by the use of the words "a warrant would
be required for law enforcement purposes"—to exclude surveillances
merely because they are targeted against an entity or person not entitled to protection under the fourth amendment. Rather, the phrase is
intended to exclude only those surveillances which would not require a
warrant even if a U.S. citizen were the target. The committee expects
that, if an agency wishes to use a new surveillance technique, it will
seek a ruling from the Attorney General as to whether the technique
requires a court order. The intelligence committees should be advised
of such rulings.

Law enforcement officials may, if they wish, continue to obtain an
ordinary search warrant or chapter 119 court order if the facts and
circumstances justify it.

### (g) "Attorney General"

Subsection (g) defines "Attorney General" to mean the Attorney
General of the United States, the Acting Attorney General, or the
Deputy Attorney General. H.R. 7308, as introduced, permitted a specially designated Assistant Attorney General to approve such applications. The administration saw a need to lessen the administrative
burden on the Attorney General which would be perpetuated even
after this bill has established the safeguards of a court order
procedure.

Relying on the assurance of Attorney General Bell in his testimony
before the Senate Judiciary Committee on S. 1566 that he would personally continue to approve applications under the bill until standards
of review have been well established, the committee has adopted a
modified version of the Administration's proposal. It provides authority for the Attorney General (or the Acting Attorney General)
or the Deputy Attorney General—rather than a specially designated
Assistant Attorney General—to approve applications for an electronic
surveillance order under this chapter. The Deputy Attorney General
is appropriate because, as the second-ranking official in the Justice
Department, he would most often be the Acting Attorney General in
the Attorney General's absence.

### (h) "Minimization procedures"

The minimization procedures of the bill provide vital safeguards
because they regulate the acquisition, retention, and dissemination of
information about U.S. persons, including persons who are not the
authorized targets of surveillance. For example, an entirely innocent
American might use a telephone that is tapped to target someone else.

55

Or an American might talk on the phone to a foreign official who is under surveillance for purposes unrelated to the particular conversation. The procedures also protect Americans who are not parties to a communication, but who are referred to in the communication; such information has in the past been disseminated for improper purposes.

Paragraph (1) of subsection (h) defines "minimization procedures" as specific procedures reasonably designed to minimize the acquisition, retention, and dissemination of any non-publicly available information concerning unconsenting U.S. persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information.

The definition begins by stating that the minimization procedures must be specific procedures. This is intended to demonstrate that the definition is not itself a statement of the minimization procedures but rather a general statement of principle which will be given content by the specific procedures which will govern the actual surveillances. It is also intended to suggest that the actual procedures be as specific as practicable in light of the technique of the surveillance and its purposes.

The definition then states that the procedures must be "reasonably designed in light of the purpose and technique of the particular surveillance." It is recognized that minimization procedures may have to differ depending on the technique of the surveillance. For instance, minimization with respect to essentially physical surveillance techniques such as closed-circuit TV and "beepers" would not be comparable to minimization of intercepted communications.

In addition, in many cases it may not be possible for technical reasons to avoid acquiring all information. In these situations, the reasonable design of the procedures must emphasize the minimization of retention and dissemination. The procedures may also differ given the purpose of the surveillance. Where the purpose of a surveillance is to obtain foreign intelligence information as defined in section 101(e)(2), the procedures may be able to be very strict with respect to what may be retained or disseminated concerning U.S. persons, and on what basis. This is reflected in paragraph (2) of this subsection, *see infra*. Where the purpose of a surveillance is to gather foreign intelligence information as defined in section 101(e)(1)(B) or (C), however, some flexibility must be provided with respect to the retention of information concerning U.S. persons. Innocuous-sounding conversations may in fact be signals of important activity; information on its face innocent when analyzed or considered with other information may become critical. Nevertheless, strict controls to preclude improper dissemination may be found necessary.

The definition of minimization speaks in terms of acquisition, retention and dissemination.

By minimizing acquisition, the committee envisions, for example, that in a given case, where A is the target of a wiretap, after determining that A's wife is not engaged with him in clandestine intelligence activities, the interception of her calls on the tapped phone, to which A was not a party, probably ought to be discontinued as soon as it is realized that she rather than A was the party. Or, where a switchboard line is tapped but only one person in the organization is

56

the target, the interception should probably be discontinued where the target is not a party. In other cases, however, it may not be possible or reasonable to avoid acquiring all conversations. It is recognized that given the nature of intelligence gathering, minimizing acquisition should not be as strict as under chapter 119 of title 18 with respect to law enforcement surveillances. For this very reason, while chapter 119 does not require minimizing retention and dissemination, this bill does.

By minimizing retention, the committee intends that information acquired, which is not necessary for obtaining, producing, or disseminating foreign intelligence information, be destroyed where feasible. For example, after determining that A's wife is not engaged with her husband in clandestine intelligence activities, her communications, acquired and retained in order to make this determination, might be able to be destroyed. Indeed, even A's communications which are clearly not relevant to his clandestine intelligence activities could be destroyed. In certain cases destruction might take place almost immediately, while in other cases the information might be retained for a reasonable period in order to determine whether it did indeed relate to one of the approved purposes. Procedures governing minimization—particularly how long information should be retained and how it should be destroyed once it is deemed irrelevant—are normally approved by the court and subject to judicial supervision.

The committee recognizes that it may not be feasible to cut and paste files or erase part of tapes where some information is relevant and some is not. Therefore, minimizing retention can also include other measures designed to limit retention of such irrelevant material to an essentially non-usable form.

Under dissemination requirements information being held to determine its usefulness should not be disseminated until that determination was made (or would only if disseminated to those who could determine its usefulness). Even with respect to information needed for an approved purpose, dissemination should be restricted to those officials with a need for such information. And, again, the judge, in approving the minimization procedures, could require specific restrictions on the retrieval of such information.

There are a number of means and techniques which the minimization procedures may require to achieve the purpose set out in the definition. These may include, where appropriate, but are not limited to:

(A) destruction of unnecessary information acquired;

(B) provisions with respect to what may be filed and on what basis, what may be retrieved and on what basis, and what may be disseminated, to whom, and on what basis;

(C) provision for the deletion of the identity of United States persons where not necessary to assess the importance or understand the information;

(D) provisions relating to the proper authority in particular cases to approve the retention or dissemination of the identity of United States persons;

(E) provisions relating to internal review of the minimization process; and

(F) provisions relating to adequate accounting of information concerning United States persons used or disseminated.

57

Minimization, however, is not required with respect to all information which may be acquired by electronic surveillance. First, publicly available information need not be minimized. By publicly available, the Committee means information which in fact is generally available to the public. Such information can include generally published information or information in the public record which is generally available to the public, e.g., statements of incorporation on file in state offices. Also included would be trade names such as a Xerox copier, a Boeing 747, etc. Second, where a person has consented to waive minimization with respect to the acquisition, retention, or dissemination of information about him through electronic surveillance, no minimization is required. The committee intends that this consent be *explicit* and *informed*. A general authorization to obtain information about him, such as may be made by a person seeking Government employment, is not sufficient. As here used, consent to waive minimization must be specific with respect to the acquisition, retention, and dissemination of information concerning the person acquired by electronic surveillance. There is not, however, any requirement that the person know the time, manner, purpose, or target of any particular surveillance. It is expected that this allowance will be used rarely and then with respect to high ranking Government officials. Obviously, refusal to consent should not in any sense be held against a person.

Finally, only information concerning a United States person need be minimized. This includes both communications to which a United States person is a party as well as communications to which he is not a party but which mention him. The Supreme Court has held that persons have no constitutionally protected right of privacy with respect to what others say about them. See *Alderman v. United States*, 394 U.S. 165 (1969). Nevertheless, the use of such information in the past has been abused, and the Executive Branch in its own porcedures has demonstrated that it can minimize the retention and dissemination of such information consistent with legitimate foreign intelligence needs. Recognizing the less substantial privacy interest in such information, however, the "reasonably designed" procedures may take account of the differences between information in which persons have a constitutionally protected interest and that in which they do not. Therefore, more flexibility in the procedures may be afforded with respect to information concerning U.S. persons obtained from communications of others. Of course, information concerning U.S. persons may come from other than communications which are intercepted, yet under circumstances where their privacy is invaded; in such situations the person subjected to the surveillance either as the target or incidentally has had his privacy interests invaded and minimization procedures are required.

Because minimization is only required with respect to information concerning U.S. persons, where communications are encoded or otherwise not processed, so that the contents of the communication are unknown, there is no requirement to minimize the acquisition, retention, or dissemination of such communications until their contents are known. Nevertheless, the minimization procedures can be structured to apply to other agencies of the Government, so that if any agency different from the intercepting agency decodes or processes the com-

58

munication, it could be required to minimize the retention and dissemination of information therein concerning U.S. persons.

It is recognized that parties to communications are unlikely to state at the outset that they are or are not U.S. persons. Intelligence officers and analysts therefore must use their judgment as to when the procedures apply. While not suggesting that the procedures require the following, as a general rule, the committee believes that persons in the United States might be presumed to be U.S. persons unless there is some reason to believe otherwise, as may well be the case depending on certain possible targets. Intelligence personnel might indicate in reports or logs that persons are not U.S. persons, therefore making self-explanatory why the information is not minimized.

The committee does not intend or expect, however, that interceptors will delete or destroy possibly meaningful information merely because there is a question whether a person is a U.S. person.

The definition states that the minimization procedures must minimize the acquisition, retention, and dissemination of information subject to minimization "consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information".

"Foreign intelligence information" is, of course, a defined term, and with respect to information concerning U.S. persons, it must be "necessary" to the listed security and foreign relations purposes. However, the definition of "minimization procedures" does not state that only "foreign intelligence information" can be acquired, retained, or disseminated. The committee recognizes full well that bits and pieces of information, which taken separately could not possibly be considered "necessary," may together or over time take on significance and become "necessary." Nothing in this definition is intended to forbid the retention or even limited dissemination of such bits and pieces before their full significance becomes apparent.

An example would be where the Government is wiretapping a known spy, who is a U.S. person. It is "necessary" to identify anyone working with him in his network, feeding him his information, or to whom he reports. Therefore, it is necessary to acquire, retain and disseminate information concerning all his contacts and acquaintances and his movements. Among his contacts and acquaintances, however, there are likely to be a large number of innocent persons. Yet, information concerning these persons must be retained at least until it is determined that they are not involved in the clandestine intelligence activities and may have to be disseminated in order to determine their innocence. Where after a reasonable period of time, which may in fact be an extended period of time, there is no reason to believe such persons are involved in the clandestine intelligence activities, there should be some effort, for example, either to destroy the information concerning such persons, or seal the file so that it is not normally available, or to make the file not retrievable by the name of the innocent person. It is recognized that the failure to gather further incriminating information concerning the contacts or acquaintances of the spy does not necessarily mean they are in fact innocent—instead, they may merely be very sophisticated and well-versed in their espionage tradecraft. Therefore, for an extended period it may be necessary to have information concerning such acquaintances re-

92

considerations, it is believed, suggest that—given the in camera procedure—the private party will be more thoroughly protected by having the special courts determine the legality of the surveillances under the bill.

The most significant change is contained in the subsection (f) provision authorizing disclosure and an adversary hearing in certain circumstances. This provision has been adopted only after lengthy discussion within the committee and a careful consideration of the suggested risk to security involved. The narrow reach of the provision should be emphasized: the adversary hearing procedures can arise only in those instances where the Government concedes that it intends to use evidence obtained or derived from an electronic surveillance (which the Government had not done in the last 10 years until the case of *U.S. v. Humphrey*, crim. no. 78-25-A, E.D. Va.).

Furthermore, the decision to remove a proceeding to one of the special courts (under subsection (f) or (g)), is entirely up to the Government in the first instance, as, of course, is the decision to prosecute. With these limitations, the committee believes that the adversary hearing provision is fully protective of those legitimate security interests which the Congress, no less than the executive branch, has a duty to safeguard.

The Congress has an equally compelling duty to insure that trials are conducted according to traditional American concepts of fair play and substantial justice. In this context, the committee believes that when the Government intends to use information against a criminal defendant obtained or derived from an electronic surveillance, and there is a reasonable question as to the legality of a surveillance, simple justice dictates that the defendant not be denied the use of our traditional means for reaching the truth—the adversary process.[49]

Where the Government states under oath that it does not intend to use evidence or information obtained or derived from electronic surveillance, the case for an adversary hearing is less persuasive and the bill does not provide for it. In such cases, however, in order to provide additional protection to the defendant, the bill (if the case is removed from the trial court) states that the matter be heard by three judges of the special court of appeals, rather than by a single judge of the special court.

It should be emphasized that in determining the legality of a surveillance under subsection (f) or (g), the judges of the special courts (or the trial judge if the matter is not removed to the special courts) are not to make determinations which the issuing judge is not authorized to make. Where the bill specifies the scope or nature of judicial review in the consideration of an application, any review under these subsections is similarly constrained. For example, when reviewing the certifications required by section 104(a)(7), unless there is a prima facie

---

[49] The committee is aware that the Supreme Court has never decided that an adversary hearing is constitutionally required to determine the legality of a surveillance. See: *Alderman v. United States*, 394 U.S. 165 (1968); *United States v. Butenko*, 494 F.2d 593 (3d Cir. 1974) (en banc), cert. denied sub nom. *Ivanov v. United States*, 419 U.S. 881 (1974); *Giordano v. United States*, 394 U.S. 310, 314 (1968) (concurring opinion of Justice Stewart.) This fact does not lessen the importance of an adversary hearing in searching for the truth and assuring a fair trial, and if the court should so decide, the procedures for an adversary hearing would already be in place. It should also be noted that in neither *Alderman* nor *Butenko* did the Government concede use of information obtained or derived from a surveillance.

93

showing of a fraudulent statement by a certifying officer, procedural regularity is the only determination to be made if a non-U.S. person is the target, and the "clearly erroneous" standard is to be used where a U.S. person is targeted. Of course, the judge is also free to review the constitutionality of the law itself.

Subsection (h) states what procedures the special courts are to follow after a determination of legality or illegality is made pursuant to subsection (f) or (g). The committee wishes to emphasize that its intent in this provision is not to legislate new procedures or in any other manner alter existing procedures with respect to what should be ordered after a finding of illegality is made. In such circumstances, the judge is directed to suppress the evidence or otherwise grant the motion "in accordance with the requirements of law." Existing case law requires the Government, in the case of an illegal surveillance, to surrender to the defendant all the information illegally acquired in order for the defendant to make an intelligent motion on the question of taint. The Supreme Court in *Alderman* v. *United States*, *supra*, held that once a defendant claiming evidence against him was the fruit of unconstitutional electronic surveillance has established the illegality of such surveillance (and his "standing" to object), he must be given those materials illegally acquired in the Government's files to assist him in establishing the existence of "taint." The Court rejected the Government's contention that the trial court could be permitted to screen the files in camera and give the defendant only material which was "arguably relevant" to his claim, saying such screening would be sufficiently subject to error to interfere with the effectiveness of adversary litigation of the question of "taint." The Supreme Court has refused to reconsider the *Alderman* rule and, in fact reasserted its validity in its *Keith* decision. (*United States* v. *U.S. District Court*, *supra*, at 393).

As the language of the bill makes clear, only that evidence which was obtained unlawfully or derived from information obtained unlawfully would be suppressed. If, for example, some information should have been minimized but was not, only that information should be suppressed; the other information obtained lawfully should not be suppressed.

A decision of illegality may not always arise in the context of suppression; rather it may, for example, arise incident to a discovery motion in a civil trial. Here, again, the bill does not specify what the court should order. Again, the court should grant the motion only "in accordance with requirements of law." Here, however, the requirements of law would be those respecting civil discovery. In other words, once the surveillance is determined to be unlawful, the intent of this section is to leave to otherwise existing law the resolution of what, if anything, is to be disclosed. For instance, under the Freedom of Information Act, other defenses against disclosure may be able to be made.

Where the court determines pursuant to subsections (f) or (g) that the surveillance was lawfully authorized and conducted, it would, of course, deny any motion to suppress. In addition, once a judicial determination is made that the surveillance was lawful, any motion or request to discover or obtain materials relating to a surveillance must

94

be denied unless disclosure or discovery is required by due process.[50]

Subsection (i) states for purposes of appeal that orders or decisions of the special courts granting or denying motions, deciding the lawfulness of a surveillance or ordering or denying disclosure shall be final, and shall be binding upon all courts of the United States and the States except the special court of appeals and the Supreme Court. As final orders they will be immediately appealable, by the private party or the government. The committee recognizes that the usual practice is to consider such orders interlocutory and not immediately appealable.

In the particular circumstances of cases handled pursuant to subsections (c)–(i), however, the committee believes that substantial considerations militate in favor of immediate appeal. Requirements to disclose certain information, whether before or after a finding of illegality, might force the Government to dismiss the case (or concede the case, if it were a civil suit against it) to avoid disclosure it thought not required. This is not the situation in normal cases, and therefore it is appropriate here to allow immediate appeal of such an order. Similarly, given the in camera and to a greater or lesser extent ex parte proceedings under subsections (f) and (g), it is appropriate to afford a more expeditious form of appeal for the private litigant. Because cases under these subsections are not expected to occur often, there is no meaningful added burden placed on the courts by allowing such interlocutory orders.

New subsection (j) has been added to the bill for the purpose of restricting the use of unintentionally acquired private domestic radio communications. The new subsection is needed because "electronic surveillance" as defined in 101(f)(3) covers only the intentional acquisition of the contents of private domestic radio communications. Such communications may include telephone calls and other wire communications transmitted by radio microwaves. Concern has been expressed that unless the use of such unintentionally acquired communications is restricted, there would be a potential for abuse if the Government acquired those kinds of domestic communications, even without intentionally targeting any particular communication. The amendment forecloses this possibility by restricting the use of any information acquired in this manner.

In circumstances involving the unintentional acquisition, by an electronic, mechanical, or other surveillance device of the contents of any radio communication, where a persons has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and where both the sender and all intended recipients are located within the United States, the contents must be destroyed upon recognition. The only exception is with the approval of the Attorney General where the contents indicate a threat of death or serious bodily harm to any person. This restriction is not intended to prevent the Government from maintaining a record of the radio frequency of the communication for later collection avoidance purposes.

---

[50] The committee recognizes that this provision alters existing law and is a limitation on existing discovery practice. It is felt that where the special court has determined that the surveillance is lawful, security considerations should preclude any disclosure unless due process requires disclosure.