LAURA E. DUFFY
United States Attorney
WILLIAM P. COLE
CAROLINE P. HAN
Assistant United States Attorney
Cal. State Bar No. 186772/250301
Federal Office Building
880 Front Street, Room 6293
San Diego, California  92101-8893
Telephone: (619) 546-6762/6968
Email:    William.P.Cole@usdoj.gov
          Caroline.Han@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE JEFFREY T. MILLER)**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   v.<br><br>BASAALY MOALIN, et al.<br><br>        Defendants. | Crim. Case No. 10CR4246-JM<br><br>**RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO TAKE DEPOSITIONS PURSUANT TO RULE 15, FED.R.CRIM.P.**<br><br>Date:  August 22, 2012<br>Time: 10:30 a.m |

**I.**

**INTRODUCTION**

Nearly two years after indictment, and making only conclusory assertions about "unavailability," defendants belatedly seek to depose eight witnesses in one of the world's most dangerous regions.  Because defendants' motion is untimely, fails to meet Rule 15's standards, poses unacceptable security risks, and throws open the door to sanction-free perjury, the Court should deny it.

//

//

//

## II.

### STATEMENT OF FACTS

**A.   The Charges**

On October 22, 2010, a federal grand jury handed up a five-count Indictment against defendants Basaaly Saeed Moalin ("Moalin"), Mohamed Mohamed Mohamud ("Mohamud"), and Issa Doreh ("Doreh").  The Indictment charged all defendants with the following offenses: (1) Conspiracy to provide material support to terrorists, in violation of 18 U.S.C. § 2339A; (2) Conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B; (3) Conspiracy to kill in a foreign country, in violation of 18 U.S.C. § 956; and (4) Conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956.  The Indictment also charged Moalin with one count of providing material support to terrorists, in violation of 18 U.S.C. § 2339A.  On November 2, 2010, Moalin was arraigned on the Indictment.  Mohamud and Doreh were arraigned the next day.

On January 11, 2011, the grand jury handed up a Superseding Indictment including the same counts, but adding defendant Ahmed Nasir Taalil Mohamud ("Nasir") as a fourth defendant on Counts 1 through 4.

On June 8, 2012, the grand jury handed up a Second Superseding Indictment, which charges the following offenses: (1) Conspiracy to provide material support to terrorists, in violation of 18 U.S.C. § 2339A (all defendants); (2) Conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B (all defendants); (3) Conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956 (all defendants); (4) Providing material support to terrorists, in violation of 18 U.S.C. § 2339A (Moalin only); and (5) Providing material support to foreign terrorist

2

organization, in violation of 18 U.S.C. § 2339B (Moalin, Mohamud, and Doreh only).[1/]

**B.  Procedural Context**

On March 30, 2012, defendants filed a statement of issues they wished to raise at the April 5, 2012 status conference. [Docket No. 140.]  In that statement, the defendants raised for the first time the prospects of taking Rule 15 depositions of "multiple witnesses in Somalia." [Id.]

At the status hearing on April 5, the Court immediately addressed the Rule 15 issue:

> [T]he first item here is a reference to depositions pursuant to Rule 15, and there's a cryptic passage here that there are multiple witnesses in Somalia who are critical to the defense and cannot travel to the United States.  If there are any issues related to depositions or discovery, I'm just going to defer all of those to the magistrate judge, Judge Gallo; and so after today's hearing, counsel can repair to Judge Gallo's chambers, and they can accommodate you setting up a status conference or some kind of hearing date in the future where they can address any such – any such concerns.  Judge Gallo is not in today, he's out for approximately a week, but his staff is ready, willing and able to receive you today if you need to address deposition or other discovery issues.

[Cole Decl., Exh. 1 at p. 4 (Transcript Excerpt).]

Immediately following the hearing, defense and government counsel went to Judge Gallo's chambers to discuss the proposed Rule 15 motion with Judge Gallo's staff.  Judge Gallo's clerk inquired as to when the defense would file the motion.   The defense did not provide any specific time.  Judge Gallo's clerk requested that, before filing the motion, the defense contact chambers concerning a hearing date.

---

[1/]    In short, the Second Superseding Indictment (1) dropped the 18 U.S.C. § 956 charge and (2) added a substantive 18 U.S.C. § 2339B charge pertaining to a $3,000 transfer in April 2008 that was already alleged in overt acts in the original Indictment. [See Indictment, dated October 22, 2010, p. 5, Overt Acts 9 and 10.]

3

Over three months later, on July 9, 2012, the defense filed a joint motion to depose eight witnesses in Mogadishu, Somalia. The defense did not obtain any hearing date from Judge Gallo's chambers. On July 12, 2012, the Court issued an order striking the joint motion for failing to obtain a hearing date as required by Criminal Rule 47.1. The order stated that the defense could re-file the motion by July 20, 2012.

On July 20, 2012, defendants filed their present motion seeking to depose eight witnesses in Somalia: Najib Mohammad, Farah Shidane (aka "Farah Yare"), Abukar Dahir Mohamed, Sheik Abdur Rahman, Sharif Qorey, Dr. Bashir Ahmed Salad, Osman Isse Nor, and Hassan Mohamud Guled. [Def's Joint Mot. at p. 2.] The moving papers included a publicly-filed declaration from defense counsel (hereafter, "Fontier Decl. I"). On August 1, 2012, defendants also provided the United States with defense counsel's previously ex parte declaration (hereafter, "Fontier Decl. II").

### III.

### ARGUMENT

#### A.   Legal Standards

Under Rule 15, foreign depositions are permitted only in "exceptional circumstances [where] it is in the interest of justice that the testimony of a prospective witness be taken and preserved for possible use at trial." United States v. Omene, 143 F.3d 1167, 1170 (9th Cir. 1998); see Fed. R. Crim. P. 15(a). "The words 'exceptional circumstances' bespeak that only in extraordinary cases will depositions be compelled." United States v. Dillman, 15 F.3d 384, 389 (5th Cir. 1994). Depositions are disfavored in criminal cases, United States v. Milian-Rodriguez, 828 F.2d 679, 686 (11th Cir. 1987), and

4

foreign deposition testimony is generally "suspect." United States

v. Alvarez, 837 F.2d 1024, 1029 (11th Cir. 1988).

District courts consider all circumstances to ensure that Rule

15(a) depositions are permitted "only in the rare cases or exceptional

circumstances contemplated by the Rule." United States v. Jefferson,

594 F. Supp. 2d 655, 665 (E.D. Va. 2009). The burden of proof on a

Rule 15 motion rests upon the movant. United States v. Zuno-Arce, 44

F.3d 1420, 1424-25 (9th Cir. 1995); United States v. Ismaili, 828 F.2d

153, 159 (3d Cir. 1987). The district court has "broad discretion"

in granting or denying the motion. Omene, 143 F.3d at 1170; United

States v. Murray, 492 F.2d 178, 194 (9th Cir. 1973), overruled on

other grounds by United States v. Cook, 608 F.2d 1175 (9th Cir. 1975);

United States v. Puchi, 441 F.2d 697, 701-02 (9th Cir. 1971) ("The

granting or denial of the motion under Rule 15(a) rests in the sound

discretion of the district court.").

Exceptional circumstances exist if "the prospective deponent is

unavailable for trial and the absence of the testimony would result

in an injustice." United States v. Sanchez-Lima, 161 F.3d 545, 548

(9th Cir. 1998). Under this standard, courts consider several

factors, including: (1) unavailability; (2) good faith efforts to

obtain the witness' presence at trial; (3) whether the movant has

demonstrated that the expected testimony would be favorable; and (4)

whether the deponents would be available for deposition and willing

to testify. Zuno-Arce, 44 F.3d at 1425. Courts also consider

timeliness, id. at 1424, and "whether the safety of United States

officials would be compromised by going to the foreign location."

United States v. Olafson, 213 F.3d 435, 442 (9th Cir. 2000). Here,

as explained below, defendants do not carry their heavy burden under Rule 15.

### B.   **Defendants' Motion is Untimely**

"[B]oth the moving party's diligence and the timing of the prospective depositions are relevant considerations to be weighed under Rule 15(a)." United States v. Drogoul, 1 F.3d 1546, 1556 (11th Cir. 1993) (quoting the Advisory Committee's note to Fed. R. Crim P. 15 for the proposition that "[a]n obviously important factor is whether a deposition will expedite, rather than delay, the administration of criminal justice"); see also Zuno-Arce, 44 F.3d at 1424-25 (affirming denial of Rule 15 motion in part because defendant offered insufficient "justification for making such a motion so close to trial"); Milian-Rodriguez, 828 F.2d at 686 (defendant failed to show exceptional circumstances for several reasons, including "the motions were filed in the late stages of the pretrial proceedings").

Here, defendants were charged almost two years ago.  They do not explain why they waited until July 2012 – only three months before trial – to file motions requesting such unprecedented relief as foreign depositions in Mogadishu, Somalia.  Even if their motion had merit, the sheer complexity of the arrangements and security concerns associated with deposing multiple witnesses in Somalia would derail the October 2012 trial date.  Defendants offer no justification for waiting so long.

Even when defendants first raised the notion of foreign depositions at the April 5, 2012 status hearing, about a year and a half had already passed since their arrests.  Then, despite the Court's direction that the parties repair immediately to Judge Gallo's chambers to address the issue, defendants did not file anything

concerning the proposed depositions until <u>three</u> <u>months</u> later.  Even then, they failed to clear any hearing date.[2/]

Defendants' untimeliness dovetails with the question of "unavailability" and "good faith efforts" to secure the witnesses' presence at trial.  As explained hereafter (<u>infra</u>, p.9), there are established mechanisms for Somali nationals to obtain a visa for travel to the United States.  The moving papers lack any indication that any of the witnesses ever even applied for a visa.  But now, because of the defendants' untimeliness, any efforts to obtain a visa or other travel authorization would seriously delay, rather than expedite, the trial.  The Court should deny the defendants' motion as untimely.

> **C.   Defendants Fail to Establish "Unavailability" and "Good Faith Efforts" to Obtain the Witnesses' Presence at Trial**

The moving party must demonstrate the unavailability of a prospective deponent through "affidavits or otherwise."  <u>Droqoul</u>, 1 F.3d at 1553.  "A witness who resides abroad and outside the reach of a court's subpoena power is not automatically unavailable without a further showing that he or she will not testify in court."  <u>United States v. Warren</u>, 713 F. Supp. 2d 1, 4 (D.D.C. 2010).  The movant must

---

[2/]   At the April 5 status hearing, Moalin's counsel stated that the defense had "alerted the government that we think August would be an opportune time to get these [depositions] done."  [Cole Decl., Exh. 1.]  Setting aside whether August could ever be "opportune" when trial is set for October, defendants delayed so long in filing their motion, that there is no way any depositions (even if ordered) could take place in August.

Furthermore, defense counsel suggest that, because they raised the <u>concept</u> of taking depositions in August, somehow the timing of their present motion "was discussed and agreed upon before the Court."  [Def's Joint Mot. at p. 9 n.2.]  This is not true.  Neither the United States nor the Court ever acknowledged or agreed that depositions would take place at all, much less that defendants would be excused for so much delay in bringing their motion.

demonstrate "good faith efforts" to obtain the witness' presence at trial.  <u>See</u> <u>Zuno-Arce</u>, 44 F.3d at 1425; <u>see also</u> <u>United States v. Ruiz-Castro</u>, 92 F.3d 1519 (10th Cir. 1996), <u>overruled on other grounds by</u> <u>United States v. Flowers</u>, 92 F.3d 1519 (10th Cir. 1996) (affirming district court's denial of a request for a telephonic deposition where the defendant "offered no proof that his father was unable to travel to the United States other than [his] statement that his father was an invalid too ill to travel"); <u>Milian-Rodriguez</u>, 828 F.2d at 686 (affirming district court's refusal to order Rule 15 depositions where, among other things, "appellant's motion did not include any supporting affidavits, except the unsigned, unsworn affidavit of" the proposed deponent).

Here, defendants' motion makes no showing of unavailability.  The moving papers do not contain <u>any</u> statement, much less any affidavit or declaration, certifying that any of the eight witnesses has actually refused to testify at trial in the United States.  To the contrary, the moving papers merely assert the following, in conclusory fashion:

- "[T]he necessary defense witnesses reside in Somalia and cannot be brought to the Court through the use of a subpoena."

- "Travel by Somali nationals to the United States is not regularly permitted, and is not feasible."

- Because "diplomatic ties have been severed, it is not possible for the eight Somali nationals who would testify at trial to obtain visas and travel to the U.S."

- "[D]efense counsel has and will make every effort to secure the witnesses' appearance . . . ."

[Def's Mot. at pp. 5, 8, 10.]

In short, defendants have not provided any affidavit stating whether any of the eight witnesses has, in fact, refused to travel to the United States for trial.  Similarly, defendants have not provided any affidavit describing the extent of their actual, good-faith efforts (if any) to convince or help the witnesses to appear at travel.  Rather, the defense merely relies upon the general notion that it is not easy for Somali nationals to get travel visas.

Considering the extreme relief requested, this showing of "unavailability" is no showing at all.  In fact, defendants' assertion that obtaining travel visas "is not feasible" is belied by defense counsel's own declaration.  In that declaration, counsel concedes not only that the State Department has procedures in place for Somali nationals to obtain both visas and passport waivers, but that the United States publicly advertises those procedures on the Internet. [Fontier Decl. I, pp. 2-3.][3/]  Far from asserting that such travel is impossible, counsel's declaration merely states that "while Somali nationals are not barred from applying for a nonimmigrant travel visa, they are very difficult and time-consuming to obtain." [Id. at p. 3.] Notably, the declaration does not state that any witness actually applied (or took any steps to do so), that any application was denied, or that defense counsel aided the process in any way.

---

[3/]    Linda Jacobson, Assistant Legal Adviser for African and Near Eastern Affairs, Department of State, confirms that there is an established process "for issuing visas to Somalis working through its embassies and consular services in countries adjacent to Somalia." [Jacobson Decl., ¶ 9.]

9

Furthermore, while securing a visa for a Somali national would take time, this only further highlights the untimeliness of defendants' motion.   Defendants cannot essentially procure the witnesses' "unavailability" by neglecting the visa application process and then choosing to file a Rule 15 motion late in the proceedings, claiming that pursuing the visa application process in time for trial is impossible.

Having received no applications, and only limited information about the proposed witnesses, the United States does not know whether the State Department or Department of Homeland Security would ultimately authorize any witness to attend trial in the United States. At present, however, the United States has no reason to believe than none could qualify.   Moreover, should any subset of the witnesses be able to appear at trial, this would, of course, impact the question of whether exceptional circumstances exist to depose any remaining witness.   Thus, defendants have belatedly put the cart before the horse – expecting the Court to order depositions in Mogadishu before even finding out which deponents could, in fact, receive authorization to appear at trial.

Finally, defendants cryptically suggest that the witnesses may "harbor fears" of "arrest and/or harassment by the United States government" should they testify in the United States.   But, again, defendants never actually state which, if any, of the proposed deponents actually expressed this fear or refused to appear at trial because of it.   Defense counsel's declaration is entirely silent on this point.   Defendants also never detail what good faith efforts, if any, they made to overcome any such fear.   There is certainly no affidavit on this point.   And, if one accepts defense counsel's

proffer concerning the witnesses, there is no apparent reason for any of them (other than, perhaps, Farah Shidane) to harbor any fear of arrest; most of the proposed deponents are described as upstanding community leaders who reportedly oppose al-Shabaab.[4/]

Because defendants fail to demonstrate "good faith efforts" or unavailability, the Court should deny the motion.

**D.   <u>Materiality</u>**

Apart from unavailability, defendants fail to demonstrate the materiality of every deponents' anticipated testimony.  In considering a Rule 15 motion, courts understandably place great emphasis on the materiality of the proposed testimony.  <u>See, e.g.</u>, <u>Zuno-Arce</u>, 44 F.3d at 1425 (identifying as key factor whether the testimony would be "favorable"); <u>United States v. Hernandez-Escarsega</u>, 886 F.2d 1560, 1569 (9th Cir. 1989) (referring to "crucial exculpatory testimony" justifying deposition); <u>Drogoul</u>, 1 F.3d at 1553 (the proposed testimony must be "highly relevant to a central issue in the case").  Testimony that is merely cumulative or corroborative of other available evidence is not sufficient to justify Rule 15 depositions.  <u>See</u> <u>United States v. Hajbeh</u>, 284 F. Supp. 2d 380, 385 (E.D.V.A. 2003)("[E]ven assuming the accuracy and validity of defense counsel's

---

[4/]     Notably, before filing their motion, defendants never contacted the United States to discuss whether the United States could provide any assurances to any proposed witness.  Rather, they dropped a footnote in their untimely moving papers that they are "amenable to discussion of safe passage for the witnesses" but that the government would have to "guarantee that they will be free from arrest and prosecution and other process, and that the government will pay the costs of their travel."  [Def's Joint Mot. at p. 11 n.4.]  A footnote is not a "good faith effort."  Furthermore, although defense counsel are all retained, they give no explanation for why the United States would have to bear all the travel costs.

proffer of [the witnesses'] testimony, that testimony is merely cumulative and corroborate, and therefore, not material.").

Materiality also implicates integrity and reliability concerns. Rule 15 depositions should not be "so incompatible with our fundamental principles of fairness or so prone to inaccuracy or bias as to render the testimony inherently unreliable." United States v. Salim, 855 F.2d 944, 953 (2d Cir. 1988). "[F]oreign deposition testimony, because of the absence of a sanction for perjury, is suspect." Alvarez, 837 F.2d at 1029; accord United States v. Feijoo-Tomala, 751 F. Supp. 40, 43 (E.D.N.Y. 1990). Both suspicion and the threat to fundamental fairness increase when the proposed witness is not only entirely outside the reach of United States justice, but not even subject to reliable identification at the deposition. See Omene, 143 F.3d at 1169-70 (affirming denial of Rule 15 deposition where the defendant had presented insufficient evidence about the identities of the witnesses to be deposed and the witnesses did not present themselves to the American Embassy with identification that could be validated by Nigerian authorities).

Here, the reliability and fundamental fairness concerns are off the chart. First, Somalia has virtually "no organized system of criminal justice" nor "any recognized or established authority to administer a uniform application of due process." [Jacobsen Decl. ¶¶ 10.] There is "likely to be no adverse consequence to testifying falsely under oath." [Id.][5/] Furthermore, the Somali Transitional Federal Government (TFG) "has no national identification system" and "it would be extremely difficult, if not impossible, to establish the

_____

[5/]   The United States has no treaty relationship with Somalia, much less any extradition treaty that could be used to seek justice for perjury or obstruction in proceedings before this Court.

1  identities of the proposed witnesses upon their appearance at any

2  deposition in Somalia."  [Id. ¶ 11.]  In fact, the United States

3  likely could not even confirm the identity, or authority, of the

4  "magistrate" who may appear.  Id.  Put simply, the criminal justice

5  system in Somalia is so fractured, and the rule of law so weak, that

6  none of the deponents would bear any legitimate fear of a perjury

7  sanction (apart from individual conscience).

8      As explained below, these concerns – coupled with the defense's

9  proffer of patently incredible testimony – eliminate any prospect of

10  fundamental fairness.  The United States discusses each proposed

11  witness, in turn.[6]

12          **1.   Hassan Mohamud Guled**

13      The defense proffers that Hassan Mohamud Guled ("Guled") will

14  testify that his nickname is "Sheikalow," and that he "recalls a

15  telephone conversation with Mr. Moalin during the time frame, and

16  covering the same subject matter, as reflected in an intercepted

17  conversation between Mr. Moalin and 'Sheikalow'." [Fontier Decl. II,

18  p. 2.]  Guled also will purportedly testify that he was a police

19  commissioner in the Galguduud region, that he was fighting against al-

20  Shabaab, that he used Moalin's house for administrative purposes, and

21  that he had a well-known reputation for always trying to resolve

22  matters peacefully.  [Id.][7] Thus, on the basis of Guled's possible

23  

24      [6]   Notably, the defense does not submit an affidavit or
declaration from any proposed deponent.  See United States v. Hajbeh,

25  284 F. Supp. 2d at 385 n.25 (noting that "the absence of any affidavit
or witness declaration makes it difficult to assess the materiality

26  of [the prospective deponent's] testimony"); United States v.

27  Jefferson, 594 F. Supp. 2d 655, 668-69 (E.D.V.A. 2009) (collecting
cases on the preference for witness affidavits or declarations).

28      [7]   The defense declaration is somewhat cryptic as to whether
(continued...)

13

recollection of a single call on an unidentified subject, the defense would apparently use Guled's testimony to argue that whenever Moalin spoke to "Sheikalow," he was speaking to Guled, not Ayrow.

This proffered testimony is so flatly contradicted by the evidence that, if offered under oath, it could only be characterized as perjury. Dozens of intercepted calls establish that "Sheikalow" was, in fact, Aden Ayrow, and was <u>not</u> a police commissioner fighting against al-Shabaab.[8]



[7](...continued)
Guled would specifically testify that he received six of the money transfers identified in the Second Superseding Indictment, but the declaration at least suggests that. [Fontier Decl. II at p. 2.]

[8]      In accordance with the protective order previously entered by the Court concerning sensitive discovery material, the United States files under seal an unredacted version of this response and its accompanying exhibits.  Also, as the defense points out, different phonetic variations of "Sheikalow" (and other Somali words) appear in discovery material.  For convenience, the United States uses the defense's spelling in this response.



[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted] –

[redacted] [redacted]

---

[9] Defendants do not explain why an obscure and allegedly peace-loving police commissioner in the Galguduud region identifies himself as al-Shabaab, plants a land mine for the Mogadishu police commissioner, conducts a mortar attack against the Prime Minister and Deputy Prime Minister in Mogadishu, and comments upon America’s view of him.



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

1   ▪ ████████████████████████████████████████

2   ████████████████████████████████████████

3   ████████████████

4   After May 1, 2008, there are no more intercepted calls involving

5   "Sheikalow" (or "Majadhub").   A stunning coincidence, to say the

6   least, if Sheikalow is really Guled, who is still alive.

7       In light of this evidence, the defense proffer concerning Guled's

8   testimony is so incredible and unreliable that the Court should not

9   permit him to testify by deposition, free from any perjury sanction

10  or live cross-examination before a jury that can witness his

11  demeanor.[10]

12      **2.     Farah Shidane a/k/a "Farah Yare"**

13      Farah Shidane (aka "Farah Yare") is "uncharged co-conspirator #1"

14  in the indictment. [See Second Superseding Indictment, p. 8.]   Again,

15  the defense proffer for Shidane raises serious reliability concerns.

16  The intercepted calls make clear that Shidane was engaged in financing

17  the fighting.   For example:



26  ───────────────────────

27  [10]     Moreover, the house that Moalin allowed Ayrow to use was
    located in Mogadishu, which is not even in the Galgaduud region. [Cole
    Decl., Exh. 14.]   So even if Moalin let Guled use his home in the
28  Galgaduud region, it would have nothing to do with the charges against
    Moalin.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20 ]11/

21    Against this proof of Shidane's status as a co-conspirator, it

22 is hard to believe that the real Shidane would even appear at a

23 deposition, much less waive his Fifth Amendment right against self-

24 incrimination.  See United States v. Moussaoui, 382 F.3d ___, 472 (4th

25 _____

26    11/    The defense proffer focuses much on Shidane's leadership
   positions in regional humanitarian or relief organizations.  But the
27 United States does not dispute that he was involved in those
   organizations, and there is already ample information in the discovery
28 concerning those matters.  The issue is not whether he was involved
   in regional administration or relief organizations, but whether he
   also was financing terrorist activities.

18

1  Cir. ___) (circumstances indicating witness will fail to testify at
2  the deposition can justify denial of Rule 15 motion).  In any event,
3  he should not be allowed to testify from afar, beyond the reach of
4  United States justice or any perjury sanction.

5          **3.  Najib Mohammed**

6      The defense proffer for Najib Mohammed does not meet the
7  materiality standard.  The proffer states that Mohammed operated a
8  call center, that Moalin used the call center service, that Mohammed
9  often shared local news with Moalin, and that Moalin transferred money
10  to Mohammed to pay for the call center service.  These facts are not
11  exculpatory in any way.  In any event, the United States does not
12  dispute them.  Thus, this proffered testimony provides no "exceptional
13  circumstances" to travel to Mogadishu to depose Najib Mohammed.

14      The proffer also states that, although Mohammed remembers
15  connecting Moalin to someone named "Sheikalow", Mohammed "believes
16  that Sheikalow was someone in charge of security in the central region
17  of Somalia."  Notably, the proffer provides no details as to why
18  Mohammed "believes" Sheikalow was someone in charge of security in
19  central Somalia, nor any non-hearsay foundation for such a "belief."
20  See Moussaoui, 382 F.3d at 482 (movant cannot demonstrate materiality
21  on basis of inadmissible evidence, such as statements made on belief
22  rather than personal knowledge); United States v. Grossman, 2005 WL
23  486735 at *3 (S.D.N.Y. 2005) (court may deny foreign deposition where
24  the proposed testimony consists of inadmissible hearsay).

25      Further underscoring the lack of materiality, defense counsel's
26  declaration attaches an FBI report and spreadsheet concerning certain
27  hawala transactions conducted by Moalin.  Defendants assert that Najib
28  Mohammed and three other of the proposed deponents are identified as

recipients on the spreadsheet. [Def's Mot. at p. 2.]  But the charges pending against the defendants do not include <u>any</u> of the transfers on that spreadsheet.   The indictment specifically identifies the money transfers at issue, none of which appears on the spreadsheet attached to defense counsel's declaration.  [<u>See</u> Second Superseding Indictment, p. 5.]  In fact, most of the transactions on the spreadsheet <u>post-date</u> the latest charge against defendants.

### 4.   Sheik Abdul Rahman a/k/a "Geedow Qorow"

This proffer also fails to meet the materiality standard.   The proffer states Sheikf Abdul Rahman would testify that he was involved in the Ilyes Foundation (a school construction organization), that Moalin supported Ilyes, that al-Shabaab opposed school development and local government, that Rahman was an Ahlu Suna leader who fought against al-Shabaab, and that Ahlu Suna (not al-Shabaab) used Moalin's home in Guriceel.   The proffer states Rahman would testify that "Sheikalow" is Guled, not Ayrow.

The proffer concerning Sheikalow's identity is inherently unreliable for the reasons already explained in great detail.  And, as with Guled, testimony that Ahlu Suna used Moalin's home in Guriceel (Galguduud region) entirely misses the mark, as the United States' allegation is that Moalin provided his Mogadishu home to Ayrow.

Furthermore, Rahman's proffered testimony that Moalin supported Ilyes (and that al-Shabaab opposed schools) is simply not the type of "crucial exculpatory testimony" that might justify a foreign deposition.  <u>Hernandez-Escarsega</u>, 886 F.2d at 1569 (9th Cir. 1989). The United States does not dispute that Moalin was an Ilyes supporter. There is no need to take a deposition in Mogadisho to establish that point.  Moreover, the fact that Moalin supported Ilyes is not evidence

that he did not provide material support to al-Shabaab.  The charge is that Moalin and his co-defendants provided material support to al-Shabaab, not that they reached philosophical agreement with al-Shabaab on every possible subject at all times.  For all these reasons, the Rahman proffer does not justify a Rule 15 deposition.

### 5.   Abukar Dahir Mohamed

The defense proffers that Abukar Dahir Mohamed would testify Moalin was a large contributor to school construction and administration in Guriceel, that Moalin sponsored students, and that Guled's nickname is "Sheikalow." The "Guled equals Sheikalow" proffer warrants no further discussion.  And, just as with Rahman, the proffer concerning Ilyes warrants no foreign deposition.  Moreover, the two specific money transfers to Mr. Mohamed identified in the proffer (Fontier Decl. II, ¶ 29) are <u>not</u> transfers charged in the indictment.

### 6.   Sharif Qorey

The defense proffers that Sharif Qorey supervised work on Moalin's house and received transfers from Moalin for that purpose. The defense also proffers that Qorey gave Ahlu Suna access to Moalin's house, and he, too, remembers someone named "Hassan" who went by "Sheikalow."

In short, the Qorey proffer mingles the unreliable and misguided information provided in the earlier proffers.  The United States alleges that Ayrow used the house in Mogadishu, not the compound Moalin was building (with Qorey's help) in Guriceel.[12]  And, as

---

[12]    The defense declaration notes that Qorey received five transfers on the spreadsheet attached to the declaration. [Fontier Decl., ¶ 33.]  The declaration fails to note, however, that none of those transferred is alleged in the indictment.

1   already explained, testimony that the "Sheikalow" in the intercepted
2   calls was Guled, not Ayrow, would be patently unreliable.

### 7.   Dr. Bashir Ahmed Salad

4       The defense proffers that Dr. Bashir Ahmed Salad would testify
5   that he knew defendant Mohamud when Mohamud was a student in
6   Islamabad, Pakistan, and that Dr. Salad stayed in touch with Mohamud
7   "and other members and leaders of the North American Islamic Council
8   (NAIC)."[13]   Dr. Salad would testify that the NAIC's goal is to "unify
9   Somali Imams under a moderate peaceful teaching" and that al-Shabaab
10  websites specifically list the NAIC as being "against al-Shabaab."
11  Thus, Dr. Salad would apparently opine that defendant Mohamud is "also
12  an al-Shabaab target."

13      This proffer does not establish materiality, but rather suffers
14  from several flaws.  First, defendants provide no explanation for why
15  they would need to depose someone in Somalia to testify as an expert
16  witness on the North American Islamic Council when they could simply
17  call members or leaders of the North American Islamic Council, who
18  presumably reside in North America, to testify at trial.  Moreover,
19  the proffer does not provide sufficient foundation to conclude that
20  Dr. Salad could provide admissible opinion testimony on the NAIC.
21  Instead, the proffer merely asserts that Dr. Salad "stayed in touch."
22  If anything, it appears Dr. Salad would merely be a hearsay conduit.
23  The proffer provides no basis to conclude that Dr. Salad could render
24  any admissible opinion, or offer any admissible testimony, that
25  Mohamud is an al-Shabaab "target."

---

[13]   After receiving the defense papers, the United States
searched the Internet for a "North American Islamic Council," without
success.  The defense may mean to refer to the "North American Council
of Somali Imams."  If so, then Dr. Salad may not even know the name
of the organization, much less have any expertise concerning it.

### 8.  Osman Isse Nor

Finally, the defense fails to establish the materiality of Osman Isse Nor's anticipated testimony.  Nor would testify that he is a member of Ahlu Suna, that he fought against al-Shabaab, that he is the current Governor of Guriceel, and that Moalin supported an orphanage in Guriceel.  Apparently, Nor would testify (or imply) that defendants' arrests hurt orphans in Guriceel. He also would testify that Guled is "Sheikalow."

There is nothing exculpatory about Nor's alleged membership in Ahlu Suna or his opposition to Al-Shabaab.  Not only do those topics have nothing to do with any elements of the offenses charged against the defendants, but the proffer itself speaks only of Nor's conflicts with Al-Shabaab from December 2008 to September 2012, a time period irrelevant to the indictment.  Furthermore, testimony that Moalin supported an orphanage is not exculpatory: nothing prevents one from supporting orphanages and terrorism.  Indeed, the proffer does not claim that Nor received any of the transfers alleged in the indictment.

In sum, the defense proffers do not establish "exceptional circumstances" justifying depositions in Mogadishu.  The proffers contain information that is immaterial, cumulative, or patently unreliable.  And even a cursory reading of the proffers reveals that, contrary to the assertion contained in the moving papers, the proposed deponents cannot identify the recipient or actual end-use of the money transfers actually identified in the Second Superseding Indictment. The Court should deny defendants' motion.

//

//

**E.   The Safety of United States Officials Would be Severely Compromised by Depositions in Mogadishu**

The Ninth Circuit has held that, in deciding whether to order a foreign deposition, the district court should consider "whether the safety of United States officials would be compromised by going to the foreign location." Olafson, 213 F.3d at 442-43; see also Jefferson, 594 F. Supp. 2d at 673 ("courts should not order Rule 15 depositions that place prosecutors, counsel, or others in jeopardy of being killed, injured or kidnapped"). In Olafson, the court held that Judge Marilyn Huff appropriately considered "that conditions in Mexico were unsafe for American prosecutors" in denying a Rule 15 motion. 213 F.3d at 442-43. Similarly, in Omene, the district court found, in denying a Rule 15 motion, "that travel to Nigeria could be dangerous." 143 F.3d at 1170.

The danger posed to prosecutors in Mexico or Nigeria pales in comparison to the dangers posed in Mogadishu, Somalia. First, the State Department warns U.S. citizens to "avoid all travel to Somalia." [Jacobson Decl., ¶ 4.] The travel warning, dated June 15, 2012, states:

> The security situation inside Somalia remains unstable and potentially dangerous. Terrorist operatives and armed groups in Somalia have demonstrated their intent to attack air operations at Mogadishu International Airport. Kidnapping, murder, illegal roadblocks, banditry, and other violent incidents and threats to U.S. citizens and other foreigners can occur in any region. Inter-clan and inter-factional fighting flares up with little or no warning. Unpredictable armed conflicts among rival militias are prevalent in southern Somalia, particularly in and around Mogadishu. This has resulted in the deaths of countless Somali nationals and the displacement of more than one million people.
>
> In February 2012, Al-Shabaab announced that it had merged with Al-Qaeda. Al-Shabaab-planned assassinations, suicide bombings, and indiscriminate armed attacks in civilian

populated areas are frequent in Somalia.  In October 2011, a car bomb explosion killed over 70 people at the Ministry of Education in Mogadishu.  That same month, another car bomb killed several people outside the Ministries of Planning and Foreign Affairs.  On November 22, 2011, an explosion killed eight people in Wadajir District, Mogadishu.  On November 28, 2011, two bombs killed at least 11 people in Sanca Junction and Yaaqshild District.  The U.S.-designated and U.N. sanctioned terrorist organization Al-Shabaab continues to pose a significant threat in Mogadishu, although considerable military progress in liberating the city has been made, as in most other parts of southern Somalia.

[Id., Exh. 1.]

Second, the airport itself has been a particular target of terrorist attacks.  In April 2009, al-Shabaab fired mortars at an aircraft carrying then-U.S. Congressman Donald Payne as the aircraft departed the Mogadishu airport.  [Cole Decl., Exh. 19.]  In claiming responsibility for the attack, al-Shabaab said it "will welcome each and every arrogant and proud enemy of Allah with similar attacks" and that "[w]hat happened to [Payne] and his escorts was only the beginning."  [Id.]  In September 2010, al-Shabaab claimed responsibility for a suicide-bombing attack on the Mogadishu airport. [Cole Decl., Exh. 20.]  "The attackers used two cars – the first exploded at the airport entrance, but a number of insurgents jumped out of the second car and opened fire, killing two African Union (AU) peacekeepers."  [Id.][14/]  Indeed, the history of extreme violence in Mogadishu is well documented. [Cole Decl., Exh. 23.]  Here, eight

---

[14/]   In fact, defendant Moalin is well aware of the dangers surrounding the Mogadishu airport, having personally discussed them many times in intercepted calls. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

proposed deponents would necessarily know precisely when and where U.S. prosecutors would be present in Somalia.  The risks are apparent.

Third, unlike Mexico, Nigeria or even Iraq or Afghanistan, there is no U.S. Embassy or other diplomatic presence in Somalia. [Jacobson Decl., ¶ 5.]  If prosecutors traveled to Mogadishu for depositions, they would be on their own, without any State Department presence to assist them with any crisis or difficulty, ranging from an attack, an accident, arrest, a medical emergency, or even a lost passport. [See id.][15/]

In sum, it is difficult to imagine foreign deposition locations more dangerous than Mogadishu.  The safety concerns weigh heavily against defendants' motion.

**F.   Other Countervailing Factors**

Despite the Court's order requesting details about how the depositions would take place, defendants provide only generalities. Although they state that they have been in touch with a purported TFG official, they do not identify the official by name or title.  They do not name the magistrate or even the court from which he or she hails.  They do not name the certified interpreter who will attend. They do not address costs.

Defendants cite several cases where depositions occurred in foreign nations under procedures not exactly like those in the United States. [See Def's Joint Mot. at pp. 6-7.]  But those cases concerned depositions in France, Switzerland, Japan, Canada and England, where the rule of law is deeply established, diplomatic relations exist, and

---

[15/]   The defense recommends the depositions take place at a SKA International Group compound at MIA.  Notably, however, the State Department evaluated SKA in June 2012 and found that it lacked sufficient security requirements to serve as State Department living or working space. [Jacobson Decl., ¶ 7.]

1    violence is not extreme.  The situation in Mogadishu could not be more

2    different.[16]

3                                    **IV.**

4                                **CONCLUSION**

5        For the foregoing reasons, the Court should deny defendants' Rule

6    15 motion.

7    DATED:      August 7, 2012

8                                         Respectfully submitted,

9                                         LAURA E. DUFFY
                                          United States Attorney
10
                                          *William P. Cole*
11                                        WILLIAM P. COLE
                                          CAROLINE P. HAN
12                                        Assistant United States Attorneys

13                                        Attorneys for Plaintiff
                                          United States of America

14

15

16

17

18

19

20

21

22

23

24
     _____

25       [16]     The defendants cite one case involving foreign depositions
     in Kabul, presumably for the proposition that allowing defendants to
26   attend the depositions by video link would satisfy Confrontation
     Clause concerns.  United States v. West, 2010 WL 3324886 (N.D. Ill.
27   2010).  Defendants' present motion implicitly (if not explicitly)
     waives defendants' physical presence at the requested depositions, so
     West is not relevant.  See Fontier Decl. I, at p. 4 (referencing
28   housing for "defense and government counsel" but making no mention of
     the defendants).

                                      27