1                  United States District Court

2                 Southern District of California

3

4   UNITED STATES OF AMERICA,      )
                                   )
5                    Plaintiff,    )
                                   )
6      vs.                         ) Case No. 10-CR-4246 JM
                                   ) Status Hearing
7   BASAALY SAEED MOALIN,          ) Thursday, April 5, 2012
    MOHAMED MOHAMED MOHAMUD,       )
8   ISSA DOREH,                    )
    AHMED NASIR TAALIL MOHAMUD,    )
9                                  )
                     Defendants.   )
10  _____ )

11

12              Before the Honorable Jeffrey T. Miller
                   United States District Judge

13

14

15

16

17

18

19

20  Official Interpreter:    Maryam Adbi, Registered Interpreter

21  Official Court Reporter: Debra M. Henson, CSR, RPR
                             U.S. Courthouse
22                           940 Front Street, Suite 5190
                             San Diego, CA  92101
23                           (619) 238-4538

24

25              Record produced by stenographic reporter

```
1    Appearances

2    For the Government:      Laura E. Duffy
                              UNITED STATES ATTORNEY
3                             William P. Cole
                              Caroline P. Han
4                             ASSISTANT U.S. ATTORNEYS
                              880 Front Street, Suite 6293
5                             San Diego, CA  92101

6    For the Defendants:
     (Mr. Moalin)            Joshua L. Dratel, Esq.
7                             Alice L. Fontier, Esq.
                              OFFICE OF JOSHUA L. DRATEL
8                             2 Wall Street, Third Floor
                              New York, NY  10005
9
     (Mr. M. Mohamud)        Linda Moreno, Esq.
10                            LINDA MORENO, P.A.
                              P.O. Box 10985
11                            Tampa, FL  33679

12   (Mr. Doreh)             Ahmed Ghappour, Esq.
                              LAW OFFICES OF AHMED GHAPPOUR
13                            P.O. Box 20367
                              Seattle, WA  98102
14
     (Mr. A. Mohamud)        Thomas A. Durkin, Esq.
15                            DURKIN & ROBERTS
                              2446 N. Clark Street
16                            Chicago, IL  60614

17

18

19

20

21

22

23

24

25
```

1        <u>San Diego, California - Thursday, April 5, 2012</u>

2         (Defendant Ahmed Nasir Taalil Mohamud is being assisted

3    by Somali interpreter Maryam Abdi.)

4              THE CLERK:  Calling matter 1 on calendar,

5    10-CR-4246, USA versus Basaaly Saeed Moalin, Mohamed Mohamed

6    Mohamud, Issa Doreh, Ahmed Nasir Taalil Mohamud, set for

7    status hearing.

8              THE COURT:  Counsel?

9              MR. COLE:  Good morning, your Honor.  William Cole

10   and Caroline Han for the United States.

11             MR. DRATEL:  Good morning, your Honor.  Joshua

12   Dratel and Alice Fontier for Basaaly Moalin, who is being led

13   to the jury box at this time.

14             MS. FONTIER:  Good morning, your Honor.

15             MS. MORENO:  Good morning, your Honor.  Linda

16   Moreno on behalf of Mohamed Mohamud, who's in custody,

17   present in the courtroom.

18             MR. DURKIN:  Tom Durkin on behalf of Ahmed Nasir

19   Taalil Mohamud, who is present and in custody.

20             MR. GHAPPOUR:  Good morning, your Honor.  Ahmed

21   Ghappour on behalf of Issa Doreh, who is present in custody.

22             THE COURT:  All right.  Thank you all.  Let the

23   record -- that's fine, gentlemen, please be seated, and

24   welcome.  Okay.  This is set for status conference today, and

25   we have a few matters I think the defense wanted to discuss.

1    The government signed or submitted a statement of issues for

2    today's hearing indicating they had no matters to be

3    addressed at this point.

4           So looking at what's been submitted by counsel for

5    defendant Moalin, the first item here is a reference to

6    depositions pursuant to Rule 15, and there's a cryptic

7    passage here that there are multiple witnesses in Somalia who

8    are critical to the defense and cannot travel to the United

9    States.  If there are any issues related to depositions or

10   discovery, I'm just going to defer all of those to the

11   magistrate judge, Judge Gallo; and so after today's hearing,

12   counsel can repair to Judge Gallo's chambers, and they can

13   accommodate you by setting up a status conference or some

14   kind of hearing date in the future where they can address any

15   such -- any such concerns.  Judge Gallo is not in today, he's

16   out for approximately a week, out of the district, but his

17   staff is ready, willing, and able to receive you today if you

18   need to address deposition or other discovery issues.

19          The second matter indicates that the defendants

20   wish to identify exculpatory material that counsel believe

21   may be, well, exculpatory, which may be in the government's

22   possession.  That's fine.  Counsel may certainly advise me in

23   writing, as they've done already, and if there's any

24   additional information that needs to be provided, they can do

25   that.  It is possible that in the future counsel and I may

1    sit down together in an ex parte setting, but that is unknown

2    at this time.

3           Okay.  Moving on, there are -- there's a third item

4    here, that counsel -- wherein counsel are suggesting that

5    they are available should the Court have any questions with

6    respect to outstanding pretrial motions.  Counsel, I

7    appreciate your offer.  At this time I do not have any

8    questions concerning outstanding pretrial motions.

9           I will give you a little bit of a status update in

10   terms of my progress here.  I do have the FISA materials in

11   my possession.  They are voluminous -- let me put it that

12   way -- they are something on the order of 2,000 pages or

13   something approaching 2,000 pages.  And so I am in the

14   process of reviewing those materials.  The CIPA materials

15   have not yet been provided to me.  I understand that they

16   will be forthcoming.  So that kind of gives you a bit of a

17   head's up as to where I am in all of this.

18          So I have no further questions of counsel at this

19   time, but, once again, I do appreciate your gracious offer as

20   you've set it forth in the third item of your status report

21   here.

22          The fourth is also a contingent suggestion.  It

23   reads, Also should the Court request an ex parte, in-camera

24   meeting with defense counsel to discuss materials submitted

25   by the government pursuant to Section 4 of CIPA and that

1   material's impact on the defense, defense counsel are

2   available.  Once again, I appreciate your offer.  At this

3   point -- I don't think at this point I could respond to it.

4           The fifth item here states that in addition,

5   defendants wish to apprise the Court of an issue with respect

6   to the interpreter who served as the Somali translator during

7   the most recent court appearance in the case.  I'm certainly

8   happy to hear any concerns you may have there.

9           And then the sixth and last item indicates that

10  defendants wish to inform the Court of ongoing difficulties

11  in obtaining independent translations of the recorded

12  conversations.

13          So that pretty much sums up where things are from

14  my perspective right now, and it looks like items 5 and 6 may

15  need some attention at this point.  Before we get to those

16  two items, anything from the government?  Even though there

17  was nothing set forth as a concern nor a request in the

18  government's status report, Mr. Cole, anything to add?

19          MR. COLE:  No, your Honor, we really -- we really

20  don't have any issues for today other than responding to what

21  the defense might have.

22          THE COURT:  Okay.  All right.  If anyone would like

23  to be heard with respect to the fifth item, please.

24          MR. DRATEL:  Your Honor, may I just briefly be

25  heard just on two other items just to give the Court some

1    more information?

2              THE COURT:  Okay.

3              MR. DRATEL:  One is on Rule 15, it was our -- and

4    we've talked to the government about this, and so we're

5    trying to do this in as efficient manner as possible, and

6    obviously we'll go to Magistrate Judge Gallo, but we wanted

7    to sort of propose to the Court and to the government just --

8    is that we will make a Rule 15 motion.  We will identify the

9    witnesses as we make a decision as to whether they are worth

10   deposing or not, and so we'll try to do that on a rolling

11   basis, but also that we were projecting that we should set

12   aside -- when I say "we," I mean counsel -- just for

13   logistical purposes and because of the nature of making these

14   plans, perhaps August until -- you know, we alerted the

15   government that we think August would be an opportune time to

16   get these done, however many they are and to try to sort of

17   get everybody's calendar in order.  And like I say, it's not

18   the Court obviously but counsel.  And so we'll be making a

19   motion and supplementing with just the individual names as we

20   add to it.

21             And also with respect to exculpatory material, we

22   did receive some additional discovery from the government

23   late or -- either early this week or late last week, and that

24   I think includes some of it and perhaps all the material that

25   we earmarked, so we don't have anything to say today about

1   that.

2              The only other thing on FISA, your Honor, is that

3   2,000 pages; that's I think unfortunate.  I think it's sort

4   of unfair to put that all on the Court.  We're happy to

5   assist in regard to that.  I think that's counsel's role, to

6   wade through that kind of material rather than make the Court

7   and staff do it.  So that's where we are on that.

8              THE COURT:  Okay.  Very good.  Thank you.  Anyone

9   else have anything to add?  Apparently not.  Okay.

10             MR. DURKIN:  Judge, did you want to discuss the

11  interpreter?

12             THE COURT:  Well, yes.  I think items 5 and 6 I

13  think are open to discussion at this point --

14             MR. DURKIN:  The issue with --

15             THE COURT:  -- if there are no other issues that

16  want -- that counsel needed to address before those two items

17  dealing with the interpreter and with any difficulty

18  concerning independent translations.

19             MR. DURKIN:  The only thing I would add to what Mr.

20  Dratel said, unless I missed it --

21             THE COURT:  Why don't you use the lectern and the

22  microphone there.

23             MR. DURKIN:  The only thing I would add is we did

24  discuss with the government that we would attempt to take

25  those depositions in August; is that correct?  We've notified

1  the government that we would attempt to have those

2  depositions taken in August.

3            MR. DRATEL:  Yes, that's right.

4            MR. DURKIN:  Maybe I missed that.

5            THE COURT:  Okay.

6            MR. DURKIN:  Judge, the interpreter issue is my

7  client's issue.  My client is the only defendant who uses the

8  court interpreter, but he also does speak some English, and

9  he apprised me after the last hearing that he thought that

10  there were simply misinterpretation going on, and I don't

11  know how we resolve that because -- I'm sure how to --

12            THE COURT:  How would he know?

13            MR. DURKIN:  Well, that's what I'm saying.  He

14  knows a little bit of English --

15            THE COURT:  Well, I assume the other -- his

16  co-defendants know quite a bit of Somali, and your -- so they

17  may have a better ability, an enhanced ability, more so than

18  your client to understand what's being translated here, or

19  interpreted.  And if your client is the only one who's

20  expressing any concern, it may be that his limited English is

21  perhaps getting in the way of his analysis here.

22            MS. MORENO:  May I be heard on that issue, your

23  Honor?

24            THE COURT:  Okay.

25            MS. MORENO:  I've also been apprised by my client,

1    who does speak Somali and does speak English, although he

2    does not have the earphones that Mr. Durkin has, that when he

3    hears -- from his vantage point, he's been at different times

4    closer to the translator and further away -- that there have

5    been significant mistranslations and mistakes that she has

6    made in translation.  So I can offer that for the Court's

7    consideration.

8            THE COURT:  Okay.  Well, it's my understanding that

9    we've been using certified Somali interpreters; am I correct

10   in that assumption?  Anyone wish to chime in?

11           MR. COLE:  Well, your Honor, I don't know.  I know

12   the chief interpreter from -- for your -- from this Court is

13   the one who's been retaining the interpreter.  I assume that

14   she's been retaining interpreters she feels are appropriate.

15   I of course don't have any ability to tell you if this is

16   good interpretation or not.

17           THE COURT:  Okay.

18           MR. GHAPPOUR:  Your Honor, if I may, my

19   understanding based on my conversations both with Ms. Moreno

20   and Mr. Durkin as well as my client is it's -- and it may

21   logically make more sense -- is that the Somali itself that's

22   being spoken doesn't sound correct.  So irrespective of

23   whether or not the translation is correct, the Somali itself

24   isn't even what was described to me as it's not even Somali a

25   second language or even Somali as a third language; the

1    quality of the language being spoken in Somali is that low.

2    So irrespective of whether or not we can make a logical, you

3    know, connection between the translation, it's the quality of

4    the language itself that's not sufficient.

5             THE COURT:  Okay.  I'll look into this then and be

6    able to provide further information for you.  How many

7    different -- I don't know -- I have not been keeping track

8    myself actually; I've just been assuming that each of the

9    Somali interpreters have been certified.  Nothing has been

10   brought to my attention before today concerning any

11   difficulties.  In any event, three of the four defendants,

12   that is, with the exception of Ahmed Mohamud, are not

13   requiring the services of a Somali interpreter; they're all

14   conversant in English, and as I say, this issue has not been

15   brought to my attention previously.

16             Are there any particular dialects or regional

17   variations of Somali that counsel may be aware of that might

18   be helpful to me as I look into this matter a bit?

19   Mr. Durkin, have you had an opportunity to address that or

20   look into that?

21             MR. DURKIN:  I have not.  Could I just speak

22   briefly with my client?  There may be a simple answer.

23             THE COURT:  Well, I don't want -- I don't want the

24   clients -- I don't want the defendants to be driving the --

25             MR. DURKIN:  No, I understand.

1          THE COURT:  -- the analysis here.  I'm advised by

2     the court clerk that -- that is, the courtroom deputy -- that

3     we've had two different interpreters here, and they're --

4          MR. DURKIN:  I believe that's correct, and that --

5          THE COURT:  -- each are -- each are certified --

6          MR. DURKIN:  I there was a male --

7          THE COURT:  -- and that our interpreters office --

8          MR. DURKIN:  -- interpreter before.  The only thing

9     I do know, Judge, is that my client is from the north, and I

10    know there's a difference between people that come -- in

11    dialect in people that come from the north versus the south,

12    and that --

13         THE COURT:  Are there separate dialects to your

14    knowledge?

15         MR. DURKIN:  I hesitate to call them dialects, but

16    I --

17         THE COURT:  Are there variations in --

18         MR. DURKIN:  I think there is.  I think they're a

19    different dialect.

20         THE COURT:  But your client hasn't -- you haven't

21    had that conversation with your client yet?  In other words,

22    he's not telling you he's from the north and he suspects that

23    the -- what he's hearing is perhaps a variation from the

24    south and therefore there might be a little bit of

25    difficulty --

1          MR. DURKIN:  He did not --

2          THE COURT:  -- or he hasn't given you any other

3     explanation as to --

4          MR. DURKIN:  I didn't get into that kind of detail

5     with him, Judge.

6          THE COURT:  Well, okay.  Well, you can --

7          MR. DURKIN:  I can try to do that.

8          THE COURT:  -- you can do that when we're not

9     taking up time with other matters.

10         MR. DURKIN:  Yes, sir.

11         THE COURT:  But I'll look into that.  And if we

12    have certified interpreters, then there's not too much more

13    the Court can do other than look into the issue with the

14    interpreters, with our chief interpreter here, and see if

15    there's any way we can enhance the -- the interpreting

16    process for your particular client --

17         MR. DURKIN:  That's fine.

18         THE COURT:  -- Mr. Durkin.

19         MR. DURKIN:  And I'll try to get more specific

20    information.

21         THE COURT:  Okay.  All right.  That will help.

22    Anything that you can provide to us by way of whether there

23    are additional dialects or whether the language may vary from

24    region to region would be helpful in that regard.  Okay.  So

25    that's the issue with the interpreter; it relates just to

1   Mr. Durkin's client, and I'll look into that.  Okay.  Then we

2   have some issue or concern regarding independent translations

3   of recorded conversations.  Who would like to speak to that?

4           MS. MORENO:  Yes, your Honor.  And it touches --

5           THE COURT:  Ms. Moreno, please.

6           MS. MORENO:  Thank you, your Honor, if I may.  And

7   it touches upon what -- some of the discussion that the Court

8   has just had.  It has been an arduous effort to get

9   translators who, one, are certified; and, two, who have no

10  conflict, meaning that the -- probably every

11  translator/interpreter that I've contacted has worked for the

12  military, the State Department, the Department of Justice,

13  and many apparently are knowledgeable about this case, have

14  had contacts with witnesses around the country, and so we

15  can't -- we can't use them.  I'm only apprising the Court

16  that we are -- we are trying to resolve this situation, but

17  we thought it was important to apprise the Court of the

18  efforts that we're making in this regard given the fact that

19  we have 1800 phone calls.  We're not talking about

20  translating all 1800 phone calls, but what we are talking

21  about is certainly not only the universe of calls that the

22  government has indicated it's going to use at the trial; I

23  would say the overwhelming majority of those phone calls are

24  all extremely edited, one minute out of a ten-minute phone

25  call, so of course we would looking at the entire phone call.

1    This takes a lot of effort and time, and it's --

2            THE COURT:  When you say they've been edited, you

3    mean the translations that you've received the government has

4    been good enough to provide are heavily edited; is that what

5    you're saying?

6            MS. MORENO:  Edited in the -- in the sense that

7    some of the translations are lifted from the middle of a

8    conversation, some of the translated transcripts are -- begin

9    in the middle of a sentence and end in another sentence.

10           THE COURT:  Understood.  So you need to have the

11   entire conversation --

12           MS. MORENO:  Exactly, your Honor.  So we just

13   wanted to apprise the Court of the ongoing efforts that the

14   defense is making in this regard and the difficulties that

15   we're encountering.

16           THE COURT:  How much headway have you made thus

17   far?

18           MS. MORENO:  Yes, we did actually -- sorry -- we

19   had a gentleman who -- actually he's I think familiar to this

20   Court -- got some of our work and became ill and had to drop

21   out and so we had to start the process all over again.

22   Apparently he's --

23           THE COURT:  You mean the process of trying to

24   obtain someone?

25           MS. MORENO:  Yes.  And so I currently have a

1   handful of resumes, all of whom indicate on the resumes that

2   these translators have worked for the State Department and

3   the Department of Justice, and so in my interviews, I'm

4   trying to vet them and send them at least information to see

5   if they have in any way touched this case.

6            THE COURT:  Okay.  And in terms of what's been

7   provided to you, the conversations that have been provided to

8   you and identified as pertinent by the government -- I think

9   there are a couple of hundred that fall into that category,

10  and then you have obviously many hundred additional

11  conversations that have been provided to you -- can you

12  quantify how far into that process you've gotten, 10 percent,

13  40 percent, 80 percent?  I mean is that --

14           MS. MORENO:  It's very, very difficult, your Honor.

15           THE COURT:  All right.  That's fine.

16           MS. MORENO:  I'm very sorry.

17           THE COURT:  Is there a division of labor that's

18  been set up so that you're kind of sharing --

19           MS. MORENO:  We are.

20           THE COURT:  -- the burden.

21           MS. MORENO:  We are a real team in that respect,

22  and certainly all of our clients have been working

23  assiduously in that regard in helping us.  But at the end of

24  the day, we have to find the certified

25  translators/interpreters we will be able to use with respect

1   to these telephone calls in the context of a trial that could

2   be potential witnesses.

3               THE COURT:  I know there have been many cases

4   involving defendants with Somalia as their country of origin

5   brought and then even tried throughout the country, and I

6   would imagine there have been translators, and perhaps many

7   translators, who have provided assistance to defense counsel

8   in connection with many of these matters.  I assume, given

9   the national scope of the collective practices of all of you,

10  you have access to these individuals, their names and contact

11  information.  Are you saying that you've really delved deeply

12  into that list and almost exhausted it without coming up with

13  people?

14              MS. MORENO:  Your Honor, I'm not saying that I've

15  exhausted it; I would be before the Court to say that, but

16  I'm not saying that.  We are just giving you a status report.

17  In fact, I have reached out to two of the translators who

18  worked on the Minnesota cases for the defense and now they're

19  working with the Department of Justice and have exclusive

20  contracts and won't work with the defense.  So there are a

21  variety and host of special problems with respect to these

22  cases.  Even though one could say that there are a lot of

23  cases involving Somalis in the country, really the pool of

24  certified Somali translators is excruciatingly small, your

25  Honor, and that is what we're having to deal with, but we --

1    we continue on.

2            THE COURT:  I think the issue of a conflict is a

3    two-way street.  I'm just trying to think out loud here a

4    little bit.  Maybe I'm off base here, but once you have a --

5    have a translator working for the defense community in one or

6    more of these cases, it presents perhaps a conflict for the

7    government to engage that individual.  Mr. Cole, do you have

8    any such limitations?

9            MR. COLE:  Well, the only thing I would add -- I

10   can't add a lot to this discussion other than to mention that

11   we have only used to my knowledge -- only linguists that we

12   have used in our case are FBI employees or contractors,

13   people who literally work for the FBI, and we have used this

14   local linguist a few times to do some work for us --

15           THE COURT:  You say FBI or contractors.

16           MR. COLE:  When I say --

17           THE COURT:  The contractor realm can be very large.

18           MR. COLE:  I don't even know why I said

19   "contractors" other than that.  I guess I just suddenly

20   realized I don't know what all their employment relationship

21   is exactly with the FBI, but my understanding is that they

22   are FBI linguists, captive FBI linguists.  We've only gone to

23   the FBI for their linguists that are on their staff to

24   translate this case.  We haven't gone to the State

25   Department, we haven't gone to the military.

1          Now, it may be -- I mean I appreciate the defense

2   vetting to make sure they don't run into some -- some buzz

3   saw with some conflict issue because it could be that someone

4   in the State Department or military knows about this case,

5   but we have not gone to those sources for translations in

6   this case; we've gone only to the FBI's language specialists,

7   and we haven't hired outside people or contracted outside

8   people.  Other than that, we did use this interpreter earlier

9   on before she became a court interpreter, to do some work --

10  not any translations we're relying on in court, not

11  anything -- we're not relying on anything that this

12  interpreter did for presentation in court, but she help us

13  with some matters early on in our case, our investigation for

14  prosecution.  So I just want to let the Court and the defense

15  know that.  I don't doubt it is difficult to find

16  interpreters, but we have not gone out and gobbled up people

17  outside --

18          THE COURT:  We're just talking about translators at

19  this point, not necessarily interpreters.

20          MR. COLE:  I'm sorry.

21          THE COURT:  There's a difference.

22          MR. COLE:  Translators, translators, yes.  We

23  haven't gone out and gobbled up any translators other than

24  those who work for the FBI.

25          THE COURT:  Okay.

1          MS. MORENO:  Okay.  That's helpful.

2          THE COURT:  So I think I'm hearing the government's

3     not out on a -- some kind of a, you know, a goal here or

4     program to co-opt all translators throughout the entire

5     country.

6          MS. MORENO:  You mean I don't get to use that

7     argument anymore, your Honor?

8          THE COURT:  I'm sorry?

9          MS. MORENO:  I don't get to use that argument

10    anymore?

11         THE COURT:  Well, no, I can appreciate that you may

12    have some difficulties locating people, but I'm assuming that

13    those translators with whom defense counsel have worked in

14    other cases would I think perhaps by government protocol or

15    policy be disqualified thereafter from translating for the

16    government because of the same types of conflict principles.

17    I thought I heard that earlier on in the case that once an

18    independent expert or translator works with the defense in a

19    similar case, that they're not brought on by the government.

20         MR. COLE:  I think, your Honor, that might be true

21    if the person worked on this case, but I don't think the fact

22    that somebody's worked for the defense -- defense bar would

23    mean they can't work for the government or vice versa.

24         THE COURT:  All right.

25         MR. COLE:  And we -- I think the big problem comes

1   into the areas, as counsel mentioned, that we did not

2   translate -- because we also have only limited resources.

3   Even though we had access to the FBI linguists, there aren't

4   as many of those as we'd like, and so that's why we didn't

5   translate entire phone calls where they're chatting about

6   this, that, or the other.  And so I understand why they would

7   want to know what those portions of the calls say.

8           As to the portions we have translated, we are more

9   than happy to sit down with the defense counsel, and if they

10  think there are things that need to be corrected in those,

11  even if they haven't used a certified translator, if they

12  have somebody who they want -- if they want our translator to

13  take a second look at a sentence based on something their

14  client tells them about the sentence, for example, we're

15  happy to try to work out issues with our translations if

16  there are any and to stipulate to changes if it's

17  appropriate.

18          THE COURT:  Think it was the vice versa reference

19  in your -- at the beginning of your statement here that

20  intrigued me a little bit.  So you were suggesting that if

21  there were a translator, for example, who had worked on

22  behalf of the defense in another case, that would not be a

23  disqualifying feature for the government, so my -- one

24  suggestion I have is if you're aware of translators who the

25  government has deemed competent and helpful in past cases

1    with the government but not on this case, you may be able to

2    provide a list, a short list, of those individuals so that

3    the defense community here can have ready access to them.

4    Obviously, they haven't worked on this case, and I would

5    assume that the reciprocity that you suggested in your

6    earlier statement would be something that defense counsel

7    would be happy to embrace; is that correct, Ms. Moreno?

8            MS. MORENO:  Absolutely, your Honor.  And it also

9    would be helpful if we could be provided a list of the names

10   of the translators that worked on the translations of these

11   transcripts.  If you could give us those names, that would be

12   very helpful in terms of our continuing endeavor.

13           THE COURT:  All right.  Well, I tell you what -- go

14   ahead.

15           MR. COLE:  All I was going to say is I'd be happy

16   to -- I can go back to our counterterrorism section in

17   Washington, DC and ask for their collective experience around

18   the country.  Be happy to provide anything we can come up

19   with in terms of cases they've seen where the other side has

20   found a translator.  I'll get those names to the defense.

21   I'm not as sanguine about providing them with the names of

22   our FBI language specialists.  There's reasons for that that

23   I could address with the Court separately, but --

24           THE COURT:  Anything you can do could be helpful to

25   move the process along.

1          MR. COLE:  Right.

2          THE COURT:  We're dealing with a lot of material in

3     this case.  Obviously the parties have a lot of material they

4     need to -- they need to review and master, the Court as well.

5     So I think that's a positive development here, and any

6     issues -- seeing as how you're going to -- we're going to

7     bring Judge Gallo into the picture here as a result of the

8     reference to Rule 15 and depositions perhaps being taken, and

9     perhaps Judge Gallo, to the extent he may be available in the

10    future, can deal with these types of issues as well; they do

11    more or less relate indirectly to discovery.

12          Before we leave these two areas we've been

13    discussing here, the interpreter for Mr. Durkin's client and

14    translators, may I have the name of the interpreter who's

15    assisting -- who's assisting us today?  I think she was on

16    our last -- at our last hearing as well.  Would you please

17    state your name and spell your name for us.

18          THE INTERPRETER:  Yes, Maryam, last name A-b-d-i.

19          THE COURT:  I'm sorry.  If you could speak louder.

20          THE INTERPRETER:  Maryam, last name A-b-d-i.

21          THE COURT:  Okay.  And it's my understanding you

22    are certified; is that correct?

23          THE INTERPRETER:  Registered.

24          THE COURT:  Registered?  All right.  What is the

25    difference, as far as you're concerned, being certified and

 1  registered?

 2          THE INTERPRETER:  Well, with the courts, the

 3  registration means that you go through the English portion of

 4  the exam.  I do work also as a -- as a contractor with

 5  several governmental agencies.  With that you are required to

 6  also take the examination in Somali and in English, so with

 7  other agencies I did have to go through the process.  But

 8  with the court system here in San Diego, only the English

 9  portion is available as of this year.

10          THE COURT:  Okay.  That's helpful.  Thank you.  And

11  the head of our interpreters here, our court interpreters

12  office, has all of your contact information obviously; is

13  that correct?

14          THE INTERPRETER:  Yes.

15          THE COURT:  All right.  Very good.  Thank you.

16  Thank you for your assistance; we do appreciate it.

17          THE INTERPRETER:  Thank you.

18          THE COURT:  Okay.  Counsel, anything further?

19          MR. DRATEL:  Yes, your Honor, if I may.  Something

20  that just came up this morning, which is the dramatic

21  difference in getting to the courtroom today, which is of

22  significant concern to us on the defense, which is the -- I

23  know that security is obviously a sensitive issue, but it's

24  at a level outside the courtroom that I think is unwarranted

25  given the fact that we've been here so many times before.

1   And just looking forward to what it's going to mean to a jury

2   I think is overwhelming in that regard and just

3   extraordinarily prejudicial to the defendants before we even

4   start the case in a way that we'll never be able to overcome.

5           THE COURT:  Well, I really don't have any -- do you

6   care to be --

7           MR. DRATEL:  Oh, yeah.  There's a magnetometer

8   outside the courtroom.

9           THE COURT:  I'm sorry?

10          MR. DRATEL:  There's a magnetometer outside the

11  courtroom for spectators to come in, and I just -- it hasn't

12  been there before.  I think downstairs the line was

13  significantly longer, and the process of getting through even

14  the magnetometer downstairs was materially different than it

15  was before, and, you know, it's just -- it's just a signal to

16  a jury that this is a different kind of case with different

17  kind of defendants, and it's just --

18          THE COURT:  Well, I think we're getting way ahead

19  of ourselves at this point.  I can allay your concern --

20  well, perhaps not -- but at least I can address the comment

21  you've made by indicating we've had magnetometers outside our

22  courtrooms in many cases in the past; I've had them in

23  several cases I've had in the past having nothing to do with

24  national security issues, but other security issues as well.

25  And I will -- I take your concern to heart, and I'll look

1   into that and I'll see why there's been some kind of a

2   change, if there has been.  I have no reason to doubt what

3   you're telling me.

4           MR. DRATEL:  And, your Honor, also just two things.

5   One is that, you know, there's not even -- I don't know of

6   the types of cases that magnetometers been outside the court

7   before, but here we haven't had any allegations of violence

8   by the defendants, any allegations of anything in the United

9   States, any of that.

10          Also, there was one other difference, which is --

11  and I'm not suggesting that -- again, this is, you know, a

12  security issue in terms of -- it's more about the appearances

13  of it and when it's done -- is that there was a dog that they

14  had to go through the courtroom before I guess the marshals,

15  which I'm just very sensitive to that being done in a way

16  that any you know, ultimately when we're down the road that

17  any juror could see, you know.  That's just a whole other

18  level of alert for a jury that's unnecessary in this case and

19  prejudicial.  Thank you.

20          THE COURT:  Okay.  Thank you.  Any other issues

21  that need to be addressed before we adjourn?

22          MR. DRATEL:  Yes.

23          THE COURT:  Mr. Dratel?

24          MR. DRATEL:  Sorry.  Your Honor, we talked among us

25  on the defense side about perhaps coming back in the

1  beginning of July, at which point we might want to set

2  in-limine schedules and some of the other things that were

3  not recalibrated when we changed the trial date.

4          THE COURT:  I think if it -- I think if all we're

5  looking at is the setting of dates for in limines and perhaps

6  other status conferences, I'm going to let that go and

7  probably set that in an order.  There will be an order

8  forthcoming obviously once I complete the review of FISA,

9  assuming that there's no need to bring counsel into the mix

10  under 1806 (f).  I haven't prejudged that issue at all, and

11  I've been through the papers on that, that is, your papers on

12  that.  But in my view, this status conference would have been

13  better put off, trailed for a period of time.  I had my staff

14  contact defense counsel, as you know, with the suggestion

15  that we do that, especially in light where I am vis-a-vis the

16  review of materials here.  But counsel did want to come in,

17  and so I certainly did not want to discourage them from

18  coming in, but in my view, this is a hearing that could have

19  been put off.

20          So having a status conference just for the sake of

21  having a status conference I'm not too concerned about.

22  Because Judge Gallo is going to become involved with

23  discovery -- and I am requesting that counsel see Judge

24  Gallo's staff after we're done here -- I don't know that we

25  need to get involved with discovery issues in the immediate

1   future.  I think it's better if, as I'm going through

2   materials and we're getting a little farther into the case,

3   that I set a status conference, if necessary, in an order,

4   and then certainly I'll be able to address the setting of a

5   date for motions in limine and also a briefing schedule for

6   motions in limine as well, keeping in mind, obviously, the

7   October date and making every effort to maintain that as a

8   firm date here.  Okay?

9          MR. DRATEL:  All right.  Thank you, your Honor.

10          THE COURT:  Okay.  Very good.  Anything further

11   from defense counsel?

12          MS. MORENO:  I'm sorry, your Honor.  And would the

13   briefing schedule also include a questionnaire, voir dire

14   protocols, et cetera?  Would that be --

15          THE COURT:  You know, if appropriate.  I don't know

16   that those are the kinds of things that we need to address in

17   a substantive order just by way of setting up a date or

18   further dates or the remaining dates in the case before we

19   proceed to trial.  I think at some point a further status

20   conference will be helpful, but I don't know that I'm ready

21   to set it right now, and I think that -- I think that at that

22   status conference we can address issues such as a

23   questionnaire, if we're going to use one and, if so, what

24   areas should be delved into; I assume that I'd be open to

25   each side submitting an exemplar of a questionnaire that they

1   would wish to have utilized in the case, as well as other

2   preliminaries.

3          So what I'm trying to get away from is just

4   automatically setting status conferences where not an awful

5   lot of business is being conducted, okay?  It may well be

6   that we have another one within a few months.  Let's just see

7   how things shake out.  Okay.  Anything from the government

8   before we adjourn?  Mr. Cole?

9          MR. COLE:  No, your Honor.  Will the court's staff,

10  before a further order comes out, just check us with dates

11  because summer's coming, and I just want to make sure we

12  don't inadvertently get dates that we're all going to be out

13  of the district or something.

14          THE COURT:  Well, you know, what might be helpful

15  is if counsel -- I was going to say if counsel advise us as

16  to any dates that they're not going to be available.  I mean

17  if counsel are aware of other dates where they're, for

18  example, going to be taking a bit of time to themselves or

19  they're involved in trial work, other trials have been set

20  that certainly look like they're going to proceed, that would

21  be helpful in terms of setting any further dates here.  I

22  just don't want to bring you all back in.  I know, you know,

23  that there are time and expense factors, and to bring you

24  back just to set dates I think would be a bit

25  counterproductive; I just don't want to impose that burden

1    particularly on the defense community.  So if you can perhaps

2    confer amongst yourselves as to your availability, for

3    example, for a date for motions in limine, it might be

4    helpful to get all motions in limine resolved no later than

5    two weeks before your trial date.  If you want to set the

6    date for motions in limine within a two- to four-week window

7    before your trial date, that's probably the better time to do

8    it.  Come up with a suggested date or two for motions in

9    limine.

10          Typically when it comes to motions in limine, I

11   like to have at least a couple of weeks -- in a case like

12   this -- a couple of weeks to go over all the material myself,

13   so I'm looking at the completion of all briefing at least two

14   weeks before the date set for motions in limine.  And then

15   you have three rounds of briefing; you have your motions that

16   are filed three weeks before that cutoff date, you have

17   opposition filed two weeks before that cutoff date, you have

18   any reply one week before the cutoff date, so you can even

19   work together on coming up with a schedule that you feel

20   would work for all of you.  If not, I mean I'll be happy to

21   set a schedule a bit farther down the road.

22          Those are the things we're looking -- we're looking

23   at from this point forward.  Obviously -- I know defense

24   counsel have suggested in their papers that it might be

25   appropriate to sit down with the Court.  I haven't made that

1    determination at this point as to whether that would be

2    necessary.  I'm still, as you know, at the beginning stages

3    of reviewing material here, so -- that's FISA material, not

4    even CIPA material, so that's pretty much where we are at

5    this point.  Anything further from the defense or the

6    government then before we draw this to a close?  Apparently

7    not.

8              Mr. Durkin, I will look into the issue of Somali

9    interpreters, and I'll think about how to address that with

10   you, whether that should be by letter or order or in some

11   other fashion.

12             MR. DURKIN:  As will I.

13             THE COURT:  If you have an opportunity to talk to

14   your -- talk to your client, that might be helpful as well.

15             MR. DURKIN:  I'm assuming they're going to be

16   downstairs for a little while this morning.

17             THE COURT:  Hopefully.  I would ask if Mr. Durkin

18   can be accommodated by meeting his client for a brief period

19   of time to get this -- get a little bit more information,

20   that would be helpful to the Court.  So let's proceed in that

21   fashion.

22             MR. DURKIN:  Thank you.

23             THE COURT:  All right.  Very good.  All right.

24   Thank you.  Then we'll adjourn for today.  Your pending -- I

25   don't have a -- I don't have a further date to set for you at

1   this point, but obviously we have many motions pending and

2   the case is designated as complex in any event, but we have

3   pending motions, and the Speedy Trial clock continues to be

4   tolled.

5           MR. DURKIN:  No objection, your Honor.

6           THE COURT:  All right.  Thank you, counsel.

7       (The proceedings were concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>Certificate of Reporter</u>

2

3    I hereby certify that I am a duly appointed, qualified, and

4    acting Official Court Reporter for the United States District

5    Court; that the foregoing is a true and correct transcript of

6    the proceedings had in the mentioned cause on the date or

7    dates listed on the title page of the transcript; and that

8    the format used herein complies with the rules and

9    requirements of the United States Judicial Conference.

10

11   Dated May 25, 2012 at San Diego, California.

12                              _____

13                              /s/ Debra M. Henson  (electronic)
                                Debra M. Henson
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25